UNITED STATES of America,
Plaintiff–Appellee,

v.

$321,470.00, UNITED STATES
CURRENCY, Defendant.

Appeal of Michael CAMBELETTA,
Movant–Appellant.

No. 87–3622.

United States Court of Appeals,
Fifth Circuit.

June 5, 1989.

Richard C. Guerriero, Jr., John Di Giulio, Baton Rouge, La., for movant-appellant.

Richard B. Launey, Asst., U.S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before WISDOM, REAVLEY, and POLITZ, Circuit Judges:

WISDOM, Circuit Judge:

In this case the owner of $321,470 in cash turned his back on what must have been pin money to him compared with the value of preserving his anonymity.

The United States brings this in rem civil forfeiture action against $321,470 under 21 U.S.C. § 881(a)(6). Section 881(a)(6) authorizes forfeiture of goods, money, and real property which the United States has probable cause to believe may be substantially connected with illegal drug transactions.[1]

Late in January 1986, Michael Cambeletta left his home in Miami, Florida, and traveled by bus to Jackson, Tennessee, in response to a telephone call from someone whom he could not or would not identify. There, at a place he could not or would not identify, except that he thought it was a construction site, a man, whom he could not or would not identify, turned over to him bundles of currency in small denominations, amounting to over $320,000. The man instructed him to carry the money to Miami. The man also lent him a brand new 1985 Ford pick-up truck and directed him to buy a camper. The man told him to take the money to the Marriott Hotel near the airport in Miami, Florida, where someone, whom he could not or would not identify, would give him further instructions. For this he received the modest sum of $1,000 and was to be reimbursed for his expenses.

On February 1, 1986, a Louisiana State Trooper stopped Cambeletta, searched the truck, and found the bundles of currency he was carrying. United States authorities seized the vehicle and its contents and started forfeiture proceedings. No one has claimed ownership of the money or the vehicle. According to Cambeletta, no one has communicated with him in regard to the money. Dead silence still shields the anonymity of the owner of the cash hoard and no one has come forward with evidence that Cambeletta had a lawful possessory interest in the hoard.

In April 1986 the United States filed a complaint against the $321,470 of currency. The district court issued an order for a warrant of arrest of the property and for notice to be published giving persons in interest ten days within which to file claims and 20 days within which to file an answer. Cambeletta filed an "Intervention Petition" as "possessor and claimant" of the currency, and then filed an answer praying that the currency "not be forfeited, but that it be delivered to intervenor". Meanwhile, the Drug Enforcement Administration (D.E.A.) had been investigating Cambelet-

---

1. 21 U.S.C. § 881(a) provides:
   (a) The following shall be subject to forfeiture to the United States and no property rights shall exist in them:
   ....
   (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of any owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

ta. The United States Attorney addressed 48 interrogatories to Cambeletta and made 28 requests for admissions of fact. He received no direct answers from Cambeletta to any question of importance. To most interrogatories Cambeletta responded by saying "not applicable" or he refused to answer "on my Fifth Amendment Right". Except for answers relying on his Fifth Amendment rights, he denied all requests for admissions of fact.

Attorneys for the United States and for Cambeletta took depositions. In February 1987 Cambeletta filed a motion to suppress and to request the court to hold an evidentiary hearing on the motion. He followed this with a motion for a summary judgment based on his contention that the United States had failed to prove a substantial connection between the money seized and illegal drug trafficking. The United States filed a motion for a summary judgment, "because [Cambeletta] has failed to demonstrate an ownership or possessory interest in the property". The district court held an evidentiary hearing on the motion to suppress and heard oral argument on all the motions.

The district court rendered a written decision on June 17, 1987, denying the intervenor's motion for summary judgment, for lack of standing to contest the forfeiture, and granting the government's motion for a summary judgment. The court rejected the argument that the government must demonstrate probable cause for forfeiture before a claimant is required to prove standing. The court also held that the intervenor's lack of standing mooted the motion to suppress. Cambeletta appeals this decision of June 17, 1987.[2] We agree with the decision and with the opinion except that portion of it which might be construed as limiting standing to contest a forfeiture only to those persons having "the requisite ownership interest" in the seized property. A lawful possessory interest in the seized property will confer standing to attack a forfeiture proceeding. Cambeletta failed to show that he had such

an interest. After due notice, the Clerk of Court entered an order of default.

## I.

On February 1, 1986, shortly after dusk on a highway in Livingston Parish, west of Baton Rouge, State Trooper David Robinson stopped Cambeletta. As the lights of Robinson's patrol car had flashed across the truck he had noticed that its bumper carried no license tag. When the truck stopped, Robertson turned on his spotlights and observed a temporary Tennessee plate behind the "curtains" in the camper. It was, he said later, "not visible unless you've got light on it"; it "was hard to see because it blended into the curtain". The windows in the camper were covered with what turned out to be towels kept in place by duct tape. There is no doubt, therefore, that the trooper had a reasonable basis for stopping the vehicle. It was not a "profile" stop.

At this point, following standard procedures, Robertson's intention was to check the driver's license and make sure that the temporary tag was current and referred to the vehicle. Cambeletta stepped out of the truck and gave the trooper an *Iowa* driver's license. It was "a little odd that [in Louisiana the driver] had an *Iowa* license and a temporary *Tennessee* plate". When Robertson asked for the motor vehicle registration card, which must be carried at all times in a motor vehicle under Louisiana law, Cambeletta "went into an explanation" saying that a friend of his had bought the truck a couple of days before and had lent it to him. He said he was going from Tennessee to Georgia or from Georgia to Tennessee (the record is confusing on this point). His friend had "loaned it to him to drive around the country". He did not have a registration certificate, but he produced a "bill of sale of some sort" for the vehicle in the name of Jerry Freeman showing that it had been bought in Memphis on January 29, 1986.

Robertson became suspicious that the truck might have been stolen. Cambeletta had produced an Iowa driver's license and

**2.** 662 F.Supp. 904 (M.D.La.1987).

had said that was he was driving to Tennessee (perhaps to Georgia) only two days after the truck had been bought by someone else in Tennessee. Cambeletta had taken a circuitous route in that he was in the Baton Rouge area of Louisiana, an out-of-the-way place considering that his immediate destination was Tennessee or Georgia; later, he said that his final destination was Miami, Florida. When Robertson asked him to explain his presence in Louisiana, Cambeletta thought for a few minutes and said that he had family all over the country and that he was going to New Orleans for Mardi Gras. That was February 1; in 1986 Mardi Gras fell on February 11, but in New Orleans some Carnival festivities precede Mardi Gras Day. Still, the natural way to go to Georgia or Tennessee, and eventually to Miami, Florida, is not by way of Louisiana. The natural way to go to New Orleans from Baton Rouge is *not* by going what Robertson called "way out" in Livingston Parish, west of Baton Rouge; he was heading east for Mississippi when there was a short, direct highway south from Baton Rouge to New Orleans.

According to Robertson, Cambeletta was "nervous and stuttering"; when asked a question "he would pause, and he would say a couple of words and pause"; he "seemed to be making things up to suit him as he went along". Robertson did not know "for sure if he was telling ... the truth", but the trooper was "suspicious of the circumstances and the answers [Cambelleta] gave". He was "nervous" and "making [Robertson] nervous". Robertson, thinking of his own safety, telephoned Sergeant Morris King to proceed to the stop. "All [Cambeletta] had was a bill of sale for the truck in someone else's name." "Putting together those things is what caused [Robertson] to investigate further". "I just knew something wasn't right." "But it's funny, I never found anything to show that he was in possession [of the

vehicle] legitimately." The trooper asked Cambeletta "if he would mind if I had a look into the truck", and would he sit in the back of the patrol car; the absence of door handles on the inside prevented one from leaving the car from its rear. They were alone and some distance from Baton Rouge; Robertson was concerned for his "own safety more than anything else". Cambeletta said, "Not at all", and sat in the patrol car. He volunteered the information that the keys to the camper were in the ashtray of the truck. Robertson then took out a Consent to Search form and read it to Cambeletta who signed it. The trooper does not appear to have exerted any coercion on Cambeletta, although it might be argued that sitting in the back of a car without handles on the doors constituted forced detention. Cambeletta, however, made no objection to getting into the police car.

Robertson found most of the money in a boot-box heavily taped with duct tape. He then called Sergeant King to "come up here now". When King arrived both searched and found more currency in a T-shirt and in a paper bag in a gym-bag. At that point Robertson called for an investigator. Shortly, Trooper Lisa Graves, a drug investigator for the State Highway Patrol and another trooper arrived at the scene. The total currency, $321,470, was in such small denominations that, later, the officers—in Cambeletta's presence—took five hours to count it.

At first, Cambeletta was not arrested, even after the money was found. Nevertheless, acting according to his understanding of proper police action, Robertson read and explained Cambeletta's Miranda rights and told him that he was free to leave although the car and contents would be seized.[3] Cambeletta was arrested about an hour after the stop when Sergeant King discovered a small cellophane bag containing two grams of cocaine, worth about $250, on the ground between the truck and

---

3. This did not mean that Cambeletta would have been abandoned at night on an isolated section of a highway. The state troopers' practice in the situation this case presents was to take the driver to the sheriff's office in Baton Rouge.

(Graves's testimony.) Here the troopers planned to drive all the cars to the St. Tammany Parish Sheriff's Office in Hammond, which was closer than Baton Rouge.

Robertson's patrol car, where Robertson and Cambeletta had been talking. King testified that the "package appeared to be fresh ... had no moisture, no dirt or anything else on the package as if it had been there for a long time." Cambeletta denied all knowledge of the cocaine. Robertson then re-read to him a card containing Miranda warnings.

In answering the officers' questions, Cambeletta denied that there was anything "wrong" about the money. He said he had known that the troopers would find it. He was carrying money "for his boss" and implied that his boss had skimmed the money in some way to the detriment of his boss' partner or to a corporation. Later, in a deposition, he said: "I just threw it [this explanation] to the officer myself. I said it could be a hundred reasons why.... I was told that it was legal money".

Trooper Lisa Graves interviewed Cambeletta. Her testimony agreed with Robertson's. She described the bundles of currency:

The money had been wrapped up in those type bundles for a very long time, which often you see in my line of work. It's almost like the barter system. In narcotics, money is bundled in $1,000 and $5,000 bundles primarily, if you are talking about a large transaction of narcotics. And if I am in the business, I will purchase from you X amount of narcotics and hand you X amount of bundles. Then, in turn, you turn and refurbish your supply, and the money just stays in those bundles. When we counted the bundles that evening, the rubber bands were so rotten on many of the bundles that they just broke open. So, they had been packaged like that for a long time.

Graves testified:

I again ask him how we can get in touch with Mr. Freeman, the owner of the truck. He states that Mr. Freeman is a friend of his who loaned him the vehicle. And I asked him, "How can I get in touch with Mr. Freeman to verify that," and he doesn't know. I ask him for a phone number; he doesn't know. I ask him for an address, he doesn't know. I ask him how he gets in touch with him; and he doesn't know.

Cambeletta was taken to the Livingston Parish jail, where he was detained for six weeks. He was booked for possession of cocaine but not indicted. It does not appear that anyone communicated with him while he was in jail.

It passes belief that the owner of the $321,740 in currency was not fully aware of what had happened.

## II.

We have gone into detail in reciting the facts incident to the stop, search, and seizure not because of the motion to suppress, an issue the district court did not reach. The facts which bear on the motion to suppress also bear on (A) Cambeletta's lack of standing to attack the forfeiture and (B) the inference of a substantial connection between the money seized and drug trafficking.

## A.

"Standing ... is literally a threshold question for entry into a federal court", because of the constitutional limitation of federal court jurisdiction to cases and controversies.[4] "This Circuit has held that the burden of establishing standing to contest a forfeiture is on the claimant seeking to come before the court. A claimant need not prove the merit of his underlying claim, but he must be able to show at least a facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement and 'prudential considerations defining and limiting the role of the court' ".[5] This principle applies to all forfeitures.

4. *U.S. v. One 18th Century Columbian Monstrance*, 797 F.2d 1370, 1373 (1986), *reh'g denied with opinion*, 802 F.2d 837 (5th Cir.), *cert. denied sub nom, Newton v. U.S.*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1988).

5. *Id.* On the burden of proof, *see also U.S. v. $364,960.00 in U.S. Currency*, 661 F.2d 319, 320 (5th Cir.1981); *U.S. v. $48,318.08*, 609 F.2d 210 (5th Cir.1980).

The district court relied on the holding in *Monstrance* that a "claimant who asserts standing to contest forfeiture of property used or imported in violation of federal law must establish that he has an ownership interest in the property subject to forfeiture".[6] That case, however, involved 18 U.S.C. § 545, as Judge Alvin Rubin, author of the opinion, carefully pointed out in distinguishing cases decided under 21 U.S.C. § 881(a)(6). In 1978, Congress amended 21 U.S.C. § 881(a)(6) to expand the government's right of forfeiture in drug cases, but under the innocent-owner exception directed that the "term 'owner' should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized".[7] Section 545 of Title 18, U.S.Code, was not amended.

It is unclear how far Congress intended to go in its 1978 amendment to § 881(a)(6). In a recent treatise on forfeiture, the author suggests that Congress may not have been aware of cases holding that an equitable interest is not sufficient to confer standing to contest a forfeiture.[8] "The language in the Joint Explanatory Statement with regard to this statutory requirement of standing may merely indicate that, by using the term 'owner', Congress did not mean to deny standing to other interested persons such as bailees and lienholders who would normally be able to file a claim or intervene in a civil forfeiture proceeding".[9]

In this circuit we have stated that "a party seeking to challenge the government's forfeiture of money or property used in violation of federal law must *first* demonstrate an interest sufficient to satisfy the court of its standing to contest the forfeiture".[10] This principle may be carried to the point that "property may be forfeited without any showing by the government that it is subject to forfeiture if the only claimant is unable or unwilling to provide evidence supporting his assertion of an interest in the property".[11] That, of course, is the situation in this case. Cambeletta is either unable or is unwilling to provide any evidence supporting his assertion that he has a lawful possessory interest in the money seized. Unlike many cases where possession has conferred standing, the owner in this case did not come forward to identify himself.

Cambeletta, who testified that at the time of his arrest he was unemployed and "down and out", denies legal ownership of the cash hoard and we cannot find any equitable ownership he had in the money. Congress certainly had no intention of elevating naked possession into equitable ownership in circumstances pointing to the likelihood that the possessor was a courier of drug money. That would defeat the objectives of the act and its 1978 amendment. We find that on the facts of this case, including the results of the later investigations by Louisiana State Police and the F.D.A., Cambeletta had no legal or equitable ownership of the seized property entitling him to standing.

We recognize that in a proceeding under § 881(a)(6) it is not necessary for an intervenor or claimant to show ownership of seized property. "It is clear that anyone with an ownership or possessory interest in at least a portion of the property may file a

---

**6.** *Id.* at 1375.

**7.** Joint Explanatory Statement of Titles II and III, P.L. No. 95–633, 95th Cong. 2nd Sess., reprinted in 1978 U.S.Code Cong. & Admin.News 9496, 9518, 9522–23.

**8.** Smith, Prosecution and Defense of Forfeiture Cases, para 4.03(1), at 4–17 (1988) [Smith].

**9.** *Id.* *U.S. v. Five Hundred Thousand Dollars,* 730 F.2d 1437 (11th Cir.1984); *U.S. v. Four Million, Two Hundred and Fifty–Five Thousand,* 762 F.2d 895, 907 n. 6 (11th Cir.1985). *But cf. U.S. v. $47,875 in United States Currency,* 746 F.2d 291, 293 (5th Cir.1984).

**10.** *U.S. v. $364,960.00 in U.S. Currency,* 661 F.2d 319, 326 (5th Cir. Unit B 1981) (emphasis added). A bailee has a possessory interest in the bailed currency. *See U.S. v. $38,000 in U.S. Currency,* 816 F.2d 1538, 1544 (11th Cir.1987), and the pertinent cases cited in opinion in that case.

**11.** Smith, para. 9.04(2)(a), at 4–55.

claim and answer."[12] We accept this statement as correct, but we qualify it by requiring that the possessory interest be a colorably lawful interest in the property.

If there is a dignified name in the law for Cambeletta's role, it is probably "bailee" or "agent" or "attorney-in-fact". Here, however, no bailor or principal has appeared to claim the cash or to support Cambeletta's explanation. In oral argument, counsel for the appellant argued that Cambeletta was an assignee. The record contains no document purporting to be an assignment, and we are not impressed with the argument that Cambeletta was an assignee. To prove an assignment, Cambeletta must show: (1) that his assignment was valid; and (2) that the assignor had a valid interest in the seized property. He can meet neither prong of this test because he has not identified the owner of the property. Of course, the assignment argument is inconsistent with his frequent denials that he owned or had control of the money.[13]

The cash hoard seized in this case was large but, by no means a record for unclaimed cash hoards. In *United States v. Five Hundred Thousand Dollars,* a forfeiture action resulted in a default judgment because no one came forward to claim what later turned out to be $900,000.[14] "Well-advised traffickers, weighing the potential risks against the likelihood of defeating the forfeiture, frequently opt not to claim the seized money. Thus, the government often obtains a default judgment when it has a weak case. To the trafficking organization, the occasional loss of such money is simply a part of the cost of doing business; it is not worth jeopardizing the organization to try to get the money back."[15]

No one can question the standing of a bailee or agent to attack a forfeiture of property subject to a lawful or even colorably lawful bailment or agency. An armored car service, a commercial delivery company, an attorney carrying his client's papers need have no qualms about this case. The right of such bailees or agents to be protected from unreasonable searches and seizures is not affected by this decision. But a courier carrying cash from an unknown owner to an unknown recipient, resolute in his determination to give no explanation except that he was asked to transport cash, the ideal mule for drug traffickers, must be prepared to demonstrate that he has a lawful possessory interest. Unexplained naked possession of a cash hoard in the factual setting of this case does not rise to the level of the possessory interest requisite for standing to attack the forfeiture proceeding. Cambeletta failed to carry his burden of proof as to his standing.

### B.

The standing issue is of course distinct from the issue of probable cause that there was a substantial nexus between the property seized and drug trafficking. Evidence developed after the stop, search, and seizure is admissible on the issue of the nexus. Many of the facts, however, which show Cambeletta's lack of standing also raise a strong inference that Cambeletta was carrying money to buy illicit drugs or money to be laundered.

The able, experienced trial judge stated that he always considered the sufficiency of the evidence to support a default judgment, regardless of the forced or unforced absence of contesting parties. He should. At the time of the hearing on the motions for summary judgment and at the time of the default hearing Cambeletta's principal could have come forward and claimed title to the money. Failure to do so raises a strong inference that the $320,000 was not as valuable as preserving the secrecy of the owner's identity.

---

**12.** Smith, para 9.04(2)(a), at 4–54.

**13.** *$364,960,* 661 F.2d 319 (5th Cir. Unit B 1981). The Court observed, "The further assertion by one of the parties in possession that he was acting as a paid courier provides an even stronger reason to doubt that party's entitlement."

**14.** 730 F.2d 1437 (11th Cir.1984).

**15.** Smith, para. 4.03(1), at 4–21 (1988).

There are many facts buttressing the inference that Cambeletta's cash hoard was derived from or would facilitate the distribution of controlled substances. (1) The amount of cocaine found, two grams, indicates that Cambeletta as a consumer had access to drug dealers—a small thing but one not without relevance. (2) The unknown owner of the cash directed Cambeletta to buy a camper and, no doubt, also directed him to take his time and take a circuitous route back to Miami. The D.E.A. investigation showed that it was common practice among drug couriers to use campers to create the impression that the courier was traveling for recreation. (3) The truck was purchased for cash at a car auction under the name "Jerry Freeman" by two men who could not be identified. (4) Investigators for the D.E.A. could not verify the existence of Jerry Freeman. (5) Two days after the car was purchased in Jackson, Tennessee, Cambeletta had it in Baton Rouge, Louisiana. (6) If, as he said, Cambeletta's first destination was either Georgia or Tennessee, and his ultimate destination Miami, he chose an unusual route to wind his way home. (7) Cambeletta's demeanor at the scene of his arrest indicates that *he* knew that he was in trouble and he knew that he had to insulate his superiors from detection. (8) The packaging in old bundles of cash in small denominations is characteristic of large drug deals.

Robert C. Parsons, Special Agent for the D.E.A., handled the investigation for the government. He testified that his investigation showed that "Cambeletta is associated with a drug-money laundering operation in the east coast of the Florida area of the United States ... the name [of which] is The Caribbean Marketing System". He also testified that the investigation disclosed not only that there was no Jerry Freeman, the alleged purchaser of Cambeletta's Ford pick-up truck, but also that fictitious addresses were provided for the licensing and registration of the vehicle; that Cambeletta was not known at the addresses he gave for the time he spent in Miami, Florida and Council Bluffs, Iowa.

Parsons summarized his analysis of the relevant facts:

> In my opinion, the totality of the circumstances involved in the seizure of the money; the method by which it was being carried; packaging; the resulting records check on Mr. Cambeletta by the Drug Enforcement Administration; the circumstances by which the vehicle, which carried the money, was purchased and was in the possession of Mr. Cambeletta; and the responses to the questions at the scene of his arrest; the possession of cocaine at the scene of his arrest; all would tend to circumstantially indicate that this money was in violation of the United States Code 881.

### III.

Possession is not always nine-tenths of the law.

We hold that a colorably lawful possessory interest in seized property provides standing to attack a forfeiture under 21 U.S.C. § 881(a)(6).[16]

■ We hold that a claimant's or intervenor's standing is the threshold issue in a forfeiture case. On the facts of this case, the claimant/intervenor, as a naked courier, carrying an unexplained cash hoard from an unknown owner to an unknown recipient in suspicious circumstances, did not have the kind of possessory interest Congress intended to protect as an innocent, legal or equitable "owner" under 21 U.S.C. § 881(a)(6). Cambeletta failed to carry his burden of proof that he had standing to claim the seized property or to intervene.

The trial judge was not clearly erroneous in holding that there was probable cause that the cash seized in this case had a substantial connection with illegal trafficking in controlled substances.

\*　　\*　　\*　　\*　　\*　　\*

---

**16.** We have considered the contention that, under Louisiana law, Cambeletta had precarious possession or, perhaps, some possession entitling him to standing to contest the forfeiture. There is no merit to the contention.

The judgment appealed from is AFFIRMED.