### UNITED STATES of America, Plaintiff,

### v.

### FORFEITURE, STOP SIX CENTER, LOCATED AT 3340 STALLCUP, FORT WORTH, TEXAS, et al., Respondent In Rem.

#### Civ. A. No. 4–91–90–K.

United States District Court,
N.D. Texas,
Fort Worth Division.

May 12, 1992.

See also 781 F.Supp. 1200.

Diane M. Kozub, William J. Anderson, U.S. Atty., Fort Worth, Tex., for U.S.

Wayne F. Salvant, Salvant & Fleming, Fort Worth, Tex., for Stop Six Center.

## MEMORANDUM OPINION

BELEW, District Judge.

Having considered the evidence, record, and credibility of the witnesses, the Court concludes, for the reasons articulated below, that Claimant Cellie Horton, the owner of the Respondent property, has estab-

lished, by a preponderance of the evidence, that she did not know the property was used to commit or to facilitate the commission of narcotics violations. The Court enters the following findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1. On January 6, 1992, the Court tried this forfeiture case against the Respondent Stop Six Center (Stop Six) property without a jury. Plaintiff, United States of America, alleges the property is forfeitable pursuant to 21 U.S.C. § 881(a)(7) because it facilitated narcotics trafficking. The government also alleges the property is forfeitable pursuant to 21 U.S.C. § 881(a)(6) because Horton purchased and improved it with narcotics proceeds. Horton and her brother, claimant Travis Glenn, dispute the government's claim that the property is forfeitable. They further claim that even if the property is forfeitable, they are innocent owners.

2. Horton purchased the Stop Six property on June 11, 1979 for $10,000. The property's legal description is Lot 1, Block 10, Sunrise Addition to the City of Fort Worth, Tarrant County, Texas. It has a street address of 3338–3348 Stallcup, Fort Worth Texas.

3. Cellie Horton, age 65, obtained Bachelor's and Master's degrees and prior to her retirement in 1988, she was employed for 30 years by the Fort Worth Independent School District (FWISD). Horton has been married to Loyd T. Horton, age 63, for 40 years. Prior to his retirement in 1988, Loyd Horton was employed by the Army Corps of Engineers. They had three sons who were born in 1956, 1957, and 1960. The Hortons had no income apart from their salaries and they purchased their home at 5561 Bong Drive, Fort Worth, Texas (which is within a few miles of the Stop Six property) by paying $65 per month for 30 years. The current value of their home is $30,000 to $35,000. In 1983, the Hortons reported $39,490 in total income on their federal tax return: $14,- 982.40 from his salary and $24,507.60 from hers.

4. Cellie Horton has five brothers and one sister, all of which live in the Fort Worth area. Claimant Travis Glenn, at age 50, is the youngest of the five children and he, along with three of the other siblings, lives in the area of Fort Worth known as "Stop Six."

5. Horton was accustomed to keeping cash and travelers checks at home. She routinely deposited part of her salary and kept the rest at home for paying living expenses or making large cash purchases. She purchased furniture, paid for college courses and saved for a new car; however, the savings for the new car eventually went toward purchase of the Stop Six property.

6. Horton discussed the purchase of the Stop Six property with Loyd Horton and her brother, Morris Glenn. Her intent was to purchase the lot as a retirement investment that she could eventually develop into a business, preferably a day-care center or restaurant.

7. At closing, Horton tendered the purchase price in cash that she had saved from her FWISD salary.

8. When purchased, the Stop Six property was an undeveloped lot. When seized, it consisted of a parking lot and retail shopping center containing 2640 square feet. Testimony consistently referred to the structure as a restaurant or club.

9. On December 2, 1980, Horton purchased loss insurance on the Stop Six property from Commercial Union Insurance Company. The policy identified the insured as the "Stop Six Restaurant c/o Travis Glenn."

10. On June 5, 1981, Glenn and Horton opened checking account No. 104–186–2, at Tarrant Bank, 1001 E. Berry Street, Fort Worth, Texas, and deposited $200.00.

11. On June 17, 1981, Horton executed a deed of trust to the Stop Six property in favor of Tarrant Bank as security for a note in the amount of $20,000. The note, signed by Horton and co-signed by Lester Jones, stated that the loan was payable on or before June 17, 1986, in equal monthly

installments of $507.87. The purpose of the loan was to construct improvements on the Stop Six property.

12. On the credit application for the $20,000 loan, Horton indicated her salary as a teacher was $11,000, and that her previous employer, from 1952 to 1956, was St. Paul Training School. She did not list a joint applicant.

13. On June 25, 1981, Lester Jones executed a guaranty agreement for the $20,000 loan.

14. On June 25, 1981, Horton deposited the proceeds of the $20,000 loan into Account No. 104–186–2. According to Tarrant Bank records, it paid the funds in Account No. 104–186–2 as follows:

| Date | Amount | Transaction |
|------|--------|-------------|
| 6–30–81 | 10,000.00 | Check payable to cash and cashed by Cellie Horton |
| 7–4–81 | 646.00 | Check to J.C. Henderson |
| 7–14–81 | 304.96 | Check to Employer Insurance of Texas |
| 7–14–81 | 56.00 | Check to S.C.A. Service Inc. |
| 7–14–81 | 4.76 | Check to Employers Casualty |
| 7–15–81 | 507.87 | Check to Travis Glenn |
| 7–24–81 | 1,315.87 | Check to Travis Glenn |
| 7–24–81 | 700.00 | Check to J.C. Henderson |
| 9–9–81 | 5,000.00 | Check to Lester Jones |
| 1–8–82 | 300.00 | Check to Henderson Electric |
| 1–16–82 | 1,000.00 | Check to Lester Jones |
| 4–28–88 | 359.04 | Check to Cellie Horton to close account |

15. According to documents produced by Claimants and Tarrant Bank, Horton made payments on the $20,000 loan as follows:

| Date | Amount | Cash or Check |
|------|--------|---------------|
| 7–16–81 | 507.87 | Unknown |
| 8–18–81 | 507.87 | Unknown |
| 9–18–81 | 507.87 | Unknown |
| 10–19–81 | 507.87 | Unknown |
| 11–18–81 | 507.87 | Unknown |
| 1–25–82 | 507.87 | Unknown |
| 2–18–82 | 507.87 | Unknown |
| 4–19–82 | 507.87 | Unknown |
| 5–19–82 | 507.87 | Unknown |
| 7–12–82 | 507.87 | Unknown |
| 8–9–82 | 507.87 | Unknown |
| 9–24–82 | 507.87 | Cash |
| 10–14–82 | 507.87 | Unknown |
| 11–16–82 | 507.87 | Unknown |
| 12–15–82 | 507.87 | Unknown |
| 1–31–83 | 507.87 | Unknown |
| 2–4–83 | 1,523.61 | Unknown |
| 8–1–83 | 9,000.00 | Cash |
| 8–2–83 | 6,391.87 | Cash |

16. On August 1, 1983 there was a cash purchase of cashier's checks and those checks were used to make the August 1, 1983 and August 2, 1983 loan payments.

17. On August 2, 1983, in consideration for payment in full, Tarrant Bank released the deed of trust securing the $20,000 loan.

18. On July 22, 1987, Horton paid $3,850.58 in property taxes owing on the Stop Six property to the City of Fort Worth and FWISD. Also, on June 30, 1989, she paid $3,083.81 in property taxes owing to the City of Fort Worth and FWISD.

19. Apart from the account at Tarrant Bank, Horton had checking accounts at the Bank of Commerce, Fort Worth, Texas, and MBank Texas East, Fort Worth.

20. Between 1981 and the date of seizure, July 26, 1988, Horton did not receive rental payments from Travis Glenn in connection with his use of the Stop Six property. She explained that she did not require rental payments because Glenn managed the restaurant and it did not produce a profit.

21. The Hortons did not take advantage of any deductions for interest, depreciation or property taxes on their federal income tax returns. However, the Hortons did take those deductions on their residence.

22. Rather than supervising operation of the Stop Six property herself, Horton chose to delegate management to Travis Glenn.

23. Claimant Travis Glenn has been married to Verlee Glenn for nearly 30 years. The Glenns have five children. From 1981 to July 26, 1988, Glenn operated a restaurant on the Stop Six property. From 1981 to 1985, the Glenns reported annual income on their federal tax return ranging from approximately $5,100 to $19,000, solely from the Stop Six restaurant. They did not file returns for 1986 through 1988.

24. From March 1982 until May 31, 1985, there was an account at the Republic Bank Fort Worth East, No. 79–514–6, in the name of Stop Six Center, 3342 Stallcup,

Fort Worth, Texas. Glenn wrote checks on this account.

25. According to the testimony of law enforcement officers, the Stop Six property was well-known to the Fort Worth law enforcement community as a situs for narcotics trafficking. Beginning in 1983, informants working for the Fort Worth Police Department (FWPD) and Drug Enforcement Administration (DEA) advised that they could purchase drugs on the Stop Six property. They also thought that Billy Ray Maddox either owned the property or Glenn, also known as "Butch", owned it and distributed drugs there.

26. In May 1987, the DEA opened an investigation of the Billy Ray Maddox drug organization. As the investigation progressed it became apparent that Maddox masterminded a large drug organization that employed people to distribute cocaine and heroin out of clubs in the Fort Worth area. From May 1987 to July 26, 1988, the investigation produced numerous indictments and convictions of members of the Maddox drug organization on multiple drug charges.

27. Prior to trial, the government presented substantial probable cause evidence indicating that Maddox used the Stop Six property for distributing narcotics. In ruling on the government's summary judgment motion the Court held that the property was a situs for substantial drug-related activity and, therefore, it played an important facilitation role. *See United States v. Forfeiture, Stop Six Center,* 781 F.Supp. 1200, 1206–1207 (N.D.Tex.1991) (listing factual findings that led to a probable cause determination under the § 881(a)(7) facilitation provision).

At trial, the government offered the testimony of several FWPD officers and DEA agents.[1] The law enforcement witnesses reiterated the events of an undercover in-

---

1. The government also offered the testimony of Randy Carter, a federal prisoner who receives the dubious distinction of being the least credible witness in this proceeding. His testimony was, to say the least, a convoluted array of unrelated facts that were often unintelligible. Although Carter eventually confirmed facts about drug activity on the property, his testimony was offered in exchange for "help with his case." He also testified that he did not know Cellie Horton and did not know whether the property was purchased with the proceeds of narcotics trafficking.

vestigation that led to the indictment and conviction of key Maddox employees.[2] Once again, after hearing substantially the same evidence as presented in the motion for summary judgment, the Court finds that the Stop Six property was a situs for narcotics trafficking.

28. The Court accepts the testimony of the DEA agents and FWPD officers with respect to the narcotics trafficking occurring on the Stop Six property. Also, the Court accepts the testimony of the law enforcement witnesses with respect to the statements made to them regarding the involvement of Travis Glenn. The Court finds that illegal narcotics trafficking occurred on the Stop Six property.

29. The government presented no evidence linking Horton to the above-mentioned narcotics transactions or any profit derived from those transactions; nor was she present at the Stop Six property when any of the events took place.

30. There was no evidence offered at trial to show that the Hortons were living beyond their means or in a lavish manner.

31. Any Conclusion of Law deemed to be a Finding of Fact is hereby adopted.

## II. CONCLUSIONS OF LAW

### *Statutory Authority*

1. This is a civil forfeiture action against the Stop Six property pursuant to 21 U.S.C. § 881(a)(6), (7). The relevant subparagraphs of § 881 provide:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

.    .    .    .    .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange ... except that no property shall be forfeited under this paragraph, to the ex-

tent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

(7) All real property, including any right, title, and interest (including any lease-hold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of an act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C.S. § 881(a)(6), (7) (1991).

2. The Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1345 and 1355. Venue is proper pursuant to 28 U.S.C. § 1395.

■ 3. In a forfeiture proceeding pursuant to 21 U.S.C. § 881, both the Supplemental Rules for Certain Admiralty and Maritime Claims and the provision of law relating to seizure, summary forfeiture, judicial forfeiture, and condemnation of property for violation of the customs laws apply. *See* 21 U.S.C.S. § 881(b), (d) (1991); 28 U.S.C.S. § 2461(b) (1991); 19 U.S.C.S. §§ 1602–1618 (1991).

### *Standing*

■ 4. "Standing ... is literally a threshold question for entry into a federal court." *United States v. $321,470 in United States Currency*, 874 F.2d 298, 302 (5th Cir.1989). "To contest a forfeiture action, an individual bears the burden of 'demonstrat[ing] an interest in the seized item sufficient to satisfy the court of his standing' as a claimant." *United States v. $38,570 in United States Currency*, 950 F.2d 1108,

---

**2.** DEA Special Agent George Barter, repeating the hearsay statements of an informant, alleged that Travis Glenn was one of Maddox's main lieutenants. Under cross-examination, Barter testified that despite a lengthy investigation, he was never able to prove that Glenn was a "lieutenant."

1111 (5th Cir.1992) (quoting *United States v. $47,875 in United States Currency*, 746 F.2d 291, 293 (5th Cir.1984)). However, a claimant need not prove his case to establish standing. *$321,470 in United States Currency*, 874 F.2d at 302. The only requirement is that a "claimant must come forth with *some* evidence of his ownership interest." *$38,570 in United States Currency*, 950 F.2d at 1112–13 (claimant must present some evidence in addition to the claim itself). Dominion and control, supported by indicators such as possession, title, financial stake or governmental admission, satisfies the standing requirement. *Id.* at 1113. When a bare claim, unsupported by other evidence of ownership, is "coupled with the government's allegations of [the claimant's] involvement with the seized *res*," the claim is sufficient to establish standing. *Id.* However, a bare assertion of ownership made by an opportunistic claimant in response to publication notice, will never suffice for standing. *Id.* at 1113 n. 6.

■ 5. Some courts have held that a person without dominion and control who holds bare legal title to seized real estate, cannot satisfy the standing requirement because they are nothing more than strawmen for narcotics traffickers. *See United States v. One Parcel of Land, Known as Lot 111–B*, 902 F.2d 1443, 1444 (9th Cir. 1990); *United States v. Premises Known as 526 Liscum Drive*, 866 F.2d 213, 217 (6th Cir.1989). However, the analysis of the "bare legal title" issue adopted by this Court prior to trial was the approach of the Eleventh Circuit in *United States v. Real Property at 5000 Palmetto Drive*, 928 F.2d 373, 375 (11th Cir.1991). *See United States v. Forfeiture, Stop Six Center*, 781 F.Supp. 1200, 1203 (N.D.Tex.1991). Requiring a claimant to disprove an inference of drug trafficking as an element of standing improperly accelerates the claimant's trial burden. *Id.* at 1202. *See $38,570 United States Currency*, 950 F.2d at 1112 (proving the merits of a forfeiture defense is not an element of standing). Absent proof at trial that Horton held bare legal title to the Stop Six property for the purpose of shielding drug traffickers or that

the initial cash purchase of $10,000 was the proceeds of drug trafficking, the mere fact that she holds legal title does not preclude her standing. *Forfeiture, Stop Six Center*, 781 F.Supp. at 1203–4.

■ 6. Horton testified that she saved $10,000 cash from her salary as a school teacher and these savings constituted the $10,000 cash purchase. It is uncontroverted that at the time of purchase the Stop Six property was undeveloped, Horton was employed by the FWISD, her husband was employed by the Army Corps of Engineers, and they had a combined 1983 income of $39,490. It is also uncontroverted that the Horton's were never suspected of narcotics trafficking. Horton testified that she intended the purchase as a retirement investment and after the purchase, she temporarily delegated management of the property to Travis Glenn. The government failed to rebut Horton's trial testimony with evidence establishing an alternative source for the purchase price sufficient to bring Horton's interest within the factual distinctions found in the "bare legal title" cases. The Court finds that the evidence presented at trial substantiates her claim of ownership and establishes the requisite standing. *See Real Property at 5000 Palmetto Drive*, 928 F.2d at 375.

7. In addition to the assertion of ownership in her claim, Horton presented *some* evidence prior to trial indicating that she had a legal interest in the Stop Six property and a financial stake in the outcome of this forfeiture action. Furthermore, the allegations in the government's complaint admit Horton had some involvement with the seized *res* and that admission is sufficient to establish standing. *38,570 United States Currency*, 950 F.2d at 1113.

8. While Glenn has not asserted a claim as owner, the government stipulated, prior to trial, that he had at least a colorable possessory interest in the Stop Six property and thus had standing to contest the forfeiture of that interest. Whether Glenn's possessory interest was truly sufficient to establish his standing is moot because of the Court's ruling on Plaintiff's Motion for

Summary Judgment. *See Forfeiture, Stop Six Center,* 781 F.Supp. at 1209–10 (Glenn is not an innocent owner and any interest he has in the property is forfeitable).

### Probable Cause

■ 9. If a claimant establishes standing, the government has the initial burden of proof requiring probable cause for the belief that a "substantial connection" exists between the property and illegal narcotics transactions. *See United States v. One 1987 Mercedes 560 SEL,* 919 F.2d 327, 331 (5th Cir.1990) (citing *United States v. $4,255,625.39,* 762 F.2d 895, 903 (11th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986)). *See also Forfeiture, Stop Six Center,* 781 F.Supp. at 1205–6 (this Court applies the substantial connection test in § 881(a)(6) and (a)(7) forfeitures). Probable cause to forfeit is "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *United States v. One 1978 Chevrolet Impala,* 614 F.2d 983, 984 (5th Cir.1980). Probable cause may be established by demonstrating " 'by some *credible evidence,* the probability that the money [used to purchase the property] was in fact drug related.' " *United States v. One 1986 Nissan Maxima GL,* 895 F.2d 1063, 1064–65 (5th Cir.1990) (quoting *United States v. $215,300.00 in United States Currency,* 882 F.2d 417, 419 (9th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990) (emphasis in original) (citation omitted)). However, probable cause to believe the property is related to "some" illegal activity does not permit its forfeiture. *United States v. $38,600.00 in United States Currency,* 784 F.2d 694, 698–99 (5th Cir.1986).

■ 10. Hearsay and circumstantial evidence are sufficient to support a finding of probable cause. *One 1987 Mercedes 560 SEL,* 919 F.2d at 331.

■ 11. Because of its status as a situs for narcotics trafficking, probable cause exists to forfeit the Stop Six property pursuant to the facilitation provision of § 881(a)(7). *Forfeiture, Stop Six Center,* 781 F.Supp. at 1207.

■ 12. Probable cause does not exist to forfeit the Stop Six property pursuant to the proceed provision of § 881(a)(6). It is important to recognize that the true miscreants in this forfeiture proceeding are Billy Ray Maddox, a convicted drug dealer who used the Stop Six property to further his illegal trade, and Travis Glenn who allegedly served Maddox while abusing his sister's trust.

At trial, the government presented extensive testimony about the Maddox organization and the transactions that took place after construction on the property was complete. The nature of the government's testimony was consistent: the Stop Six restaurant and its adjoining parking lot provided a situs for narcotics trafficking. Although the trial testimony provided overwhelming support for the Court's pretrial finding of § 881(a)(7) probable cause, it did not convince the Court that Horton's initial purchase and improvement of the property was in fact drug-related. Without exception, law enforcement officers testified that they did not know Horton, had never seen her before, and did not consider her a suspect in the Maddox investigation.[3] They further testified that their knowledge was limited to events that took place after the Stop Six construction was complete. As a result, the government did not present a credible witness whose testimony established that Horton's money was drug-relat-

---

**3.** Special Agent Barter testified that the DEA conducted a background investigation on Horton and subsequently dismissed her as a suspect. The DEA did not have any information concerning Horton and her name never came up during the investigation of Maddox. He also admitted that the DEA did not have any evidence indicating that Horton purchased the Stop Six property with drug proceeds.

Officer Berrera testified that he saw Horton enter the restaurant on one occasion as he passed the property during routine patrol. However, Berrera's statement is consistent with Horton's testimony that she made a weekly visit to the restaurant to pick up a meal.

ed. Rather, the government's theory is that once Maddox infected the property, forfeitability spread like a disease engulfing every conceivable interest in the property.

According to the government, the initial $10,000.00 cash purchase of the vacant lot, cash payments on the construction loan, and two cash tax payments, all of which were made over a ten year period from 1979 to 1989, were the proceeds of drug trafficking. In support of this conclusion, the government cites information provided by informants indicating that Glenn, at least to some degree, was working for Billy Ray Maddox. It is undisputed that Glenn was never arrested, indicted or convicted in connection with the Maddox investigation. Evidence showing Glenn or Maddox purchased the property and paid for the improvements with drug-related funds would suffice to support a probable cause finding. No such evidence exists.

Another probable cause scenario would exist if Horton's testimony were patently incredible. Horton testified that the initial purchase price for the vacant lot, loan and tax payments came from her salary as a school teacher. She also testified that Glenn was unemployed and that he never gave her any money. She did not know Billy Ray Maddox and did not know that her brother was involved with drugs. The Court recognizes that family members are not always aware of drug abuse or other criminal activity within the family.

In *One 1987 Mercedes 560 SEL*, the Fifth Circuit held that the probable cause evidence, when evaluated as a whole, went beyond mere suspicion and the government successfully established a substantial connection to narcotics trafficking. The following facts established the requisite probable cause:

(1) The bank account bearing the name of Jones's [the claimant's] business was established soon after the first load of marihuana arrived; (2) the bank account, in which Jones deposited more than $315,000, primarily received cash deposits; (3) the bank account funds were used to purchase a luxury automobile for Jones's nephew Scott, who was arrested and subsequently convicted for his involvement with the marijuana trafficking; (4) Jones purchased a luxury automobile and a $50,000 CD with checks from this account; (5) he purchased for cash $75,000 in assets over an eight-month period, despite tax returns showing that his adjusted gross income in 1985 was $39,191 and in 1986 was $42,645; and (6) finally and most importantly, Jones was identified as a money man by two individuals involved with both loads of marijuana.

*One 1987 Mercedes 560 SEL*, 919 F.2d at 331–32. The court explained: "[t]he bank's paper trail of largely cash deposits, in conjunction with two witnesses' identifying [the claimant] as a money man, as well as his arrest while with a co-defendant, is sufficient to show a substantial connection between Jones's assets and drug trafficking proceeds." *Id.* at 332.

In comparison, the facts in the instant case fail to rise above the level of mere suspicion. Horton was employed as a school teacher for her entire adult life and she routinely saved approximately $300 per month from her salary for future cash purchases. Prior to June 11, 1979, she saved at least $10,000 which she used to purchase the undeveloped lot. From June 11, 1979 to August 1, 1983, she saved $15,000 which she used to make two final cash payments on the construction loan for the Stop Six property. From August 2, 1983 to July 22, 1987 she saved at least $3,850 which she used to pay property taxes on the property, and from July 22, 1987 to June 30, 1989 she saved at least an additional $3,083 paid as property taxes. The Horton's 1983 income of $39,490 indicates that the above savings were at least possible.

Because the government failed to produce evidence that Horton's assets were drug-related, the Court finds that the requisite substantial connection does not exist to generate probable cause under § 881(a)(6). Absent such evidence, the Court rejects the inference that Horton's assets were supplemented by the Maddox organization. A contrary finding, that the

evidence of probable cause is sufficient, necessarily subjects the property of any relative or acquaintance of a suspected drug trafficker to forfeiture simply because a purchase was made with cash. This Court refuses to adopt such a draconian interpretation of the forfeiture laws. *Compare United States v. Twenty (20) Cashier's Checks,* 897 F.2d 1567, 1570 (11th Cir.1990) (despite strong inference to the contrary, there was no probable cause to forfeit property belonging to sisters of convicted drug trafficker); *with One 1986 Nissan Maxima GL.,* 895 F.2d at 1064–65 (probable cause existed to forfeit car allegedly belonging to girlfriend of convicted drug trafficker). Although Glenn may have been in the drug business, the evidence before the Court indicates that Horton was not.

■■■ 13. Once the government establishes probable cause, the burden shifts to the claimants to show, by a preponderance of the evidence, that they have a defense to the forfeiture. *United States v. One Single Family Residence,* 933 F.2d 976, 979 (11th Cir.1991); 21 U.S.C.S. 881(d). Even if the government had sustained its § 881(a)(6) probable cause burden, the Court finds that Horton established, by a preponderance of the evidence, that she had an independent, non-drug-related source for the money she used to purchase and improve the property—her income. In *United States v. One 1980 Rolls Royce,* the Fifth Circuit acknowledged the distinction between claimants with legitimate incomes from those that have no apparent source of income. 905 F.2d 89, 90 (5th Cir.1990). The court found the following commentary particularly persuasive:

> A problem of proof arises where the government makes the mistake of trying to forfeit literally everything owned by the drug trafficker, including a great many items of small value. If the trafficker can show any non-drug income, fairness dictates that he ought to be able to keep a portion of his total assets corresponding to the proportion his non-drug income bears to his drug-derived income.

*One 1980 Rolls Royce,* 905 F.2d at 91 (quoting D. Smith, Prosecution and Defense of Forfeiture Cases, ¶ 4.03[4][e] at 4–51 (Supp. Jan. 1990)). Accordingly, "[i]f part of a piece of property is 'proceeds' under § 881(a)(6) and part of the property was acquired with clean money, only that portion which constitutes proceeds is subject to forfeiture." *Id.*

■■■ In this case, the government did not prove that Horton had a drug-derived income. Nor did it prove that Glenn or Maddox had financed the purchase or development of the Stop Six property. The evidence supports the contention that the Hortons had income sufficient to live, albeit in a frugal manner, and at the same time, finance the improvements on the Stop Six property.

### The Innocent Owner Defense

■■■ 14. While the forfeiture statutes are a powerful weapon in the war on drugs, Congress did not intend to deprive innocent owners of their property. Claimants can shelter their interest in seized property under the "innocent owner" defense if there is proof, by a preponderance of the evidence, that the alleged narcotics activity was committed without the claimant's knowledge or consent. *See United States v. Certain Real and Personal Property,* 943 F.2d 1292, 1296 (11th Cir. 1991); *United States v. Lot 9, Block 2 of Donnybrook Place,* 919 F.2d 994, 999 (5th Cir.1990); 21 U.S.C.S. § 881(a)(7).

■■■ 15. Under the innocent owner defense, a claimants' burden is to establish *either* that they had no knowledge of the narcotics activity *or,* if they had knowledge, that they did not consent to it. *Forfeiture, Stop Six Center,* 781 F.Supp. at 1209. *See United States v. Certain Real Property and Premises, Known as 890 Noyac Road,* 945 F.2d 1252, 1260 (2d Cir. 1991); *United States v. One 107.9 Acre Parcel of Land,* 898 F.2d 396, 398 (3d Cir. 1990).

■■■ 16. Claimants must prove the absence of "actual" rather than constructive knowledge of the illegal narcotics activity. *See United States v. One Single*

*Family Residence*, 933 F.2d 976, 982 (11th Cir.1991); *United States v. $10,694.00 United States Currency*, 828 F.2d 233, 234–35 (4th Cir.1987); *United States v. 1980 Red Ferrari*, 827 F.2d 477, 478 (9th Cir.1987); *United States v. 1977 Porsche Carrera 911*, 748 F.Supp. 1180, 1184 (W.D.Tex.1990), *aff'd*, 946 F.2d 30 (5th Cir. 1991). If they had actual knowledge of the activity, they must prove their lack of consent by demonstrating they took all reasonable steps to prevent it. *United States v. 141st Street Corp.*, 911 F.2d 870, 878 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991).

■ 17. Although hearsay *is* admissible on the issue of probable cause, it is *not* admissible to rebut the innocent owner defense. *See United States v. Parcel of Real Property Known as 6109 Grubb Road*, 886 F.2d 618, 622 (3d Cir.1989); *United States v. One Parcel of Real Estate Located at 13430 S.W. 1st Street*, 789 F.Supp. 387, 390–91 (S.D.Fla.1992); *United States v. Property Identified as 908 T Street*, 770 F.Supp. 697, 702–703 (D.D.C.1991); *United States v. All Monies ($447,048.62) In Account No. 90–3617–3*, 754 F.Supp. 1467, 1471 (D.Hawaii 1991); *United States v. All Right, Title and Interest in Property and Premises known as 710 Main Street*, 744 F.Supp. 510, 519 (S.D.N.Y.1990); D. Smith, *Prosecution and Defense of Forfeiture Cases*, ¶ 11.03[5] at 11–19 (1991) ("government's hearsay is only admissible on the preliminary probable cause issue and not on the merits of the dispute").

18. Claimant Travis Glenn is not an innocent owner. *Forfeiture, Stop Six Center*, 781 F.Supp. at 1209–10.

■ 19. There was no evidence indicating that Horton was notified or questioned about the illegal activity occurring on the property. Nor was there evidence that Horton, her husband or her brother

Morris Glenn were aware of Travis Glenn's relationship with Maddox. Horton emphasized repeatedly that she did not know about the narcotics transactions or any other illegal activity on the property. It is also noteworthy that Horton was never confronted with the information that her property was a haven for drug dealers. If she had been confronted she would be put to the task of disproving her consent, a difficult, if not insurmountable burden under the facts of this case.

The government did not rebut Horton's alleged lack of knowledge with credible, non-hearsay evidence. Instead, it relied on previously admitted evidence directed toward the issue of probable cause and emphasized that Horton's testimony was incredible. While Horton could never claim that she had attained the clarity of a practiced witness, her testimony was not inherently incredible. It is reasonable to assume that Glenn and the Maddox organization tried to conceal their narcotics business. Furthermore, drug transactions take only a few minutes to complete and are often difficult for the untrained observer to detect.

Horton testified that prior to managing the Stop Six restaurant Glenn was unemployed and, later, he did not make enough money from the restaurant to pay rent. Special Agent Barter also testified that Glenn was not living beyond his means. It is possible that Glenn did not have the outward appearance of a drug dealer and the Stop Six property did not appear to be a drug distribution point. Also, it would not be unusual for a 65 year old woman to be ignorant of the drug dealing world. The government assumes the worst possible explanation for Horton's ownership, but it makes that assumption without evidence to rebut her claim of innocent ownership.[4]

20. Since Claimant Cellie Horton lacked knowledge of the drug activity, she has

4. The government contends that pervasive law enforcement activity on the property negates Horton's claimed lack of knowledge. It further contends that the property's "reputation" indicates that she had knowledge. The problem is that neither indicator of knowledge is as strong as the government suggests. While law enforcement officers conducted an undercover investigation utilizing numerous informants, the government is incorrect in its characterization of the facts as pervasive. The facts indicate that over the entire operational existence of the Stop Six property (approximately seven years), there were four separate "incidents" which might draw the attention of an owner or the community. Those incidents were arrests that oc-

successfully established the § 881(a)(7) innocent owner defense and may continue her ownership of the Stop Six property.

21. Any Finding of Fact deemed a Conclusion of Law is hereby adopted.

## JUDGMENT

This action came on for trial before the Court, Honorable David O. Belew, Jr., United States District Judge presiding, and the issues having been duly tried and the Court having made its findings of fact and conclusions of law in a Memorandum Opinion entered this same date;

It is hereby ORDERED, ADJUDGED AND DECREED that the Plaintiff, United States of America, shall take nothing by way of its claims against the Respondent property.

It is further ORDERED Claimant Cellie Horton shall retain all right, title, claim and interest in and to the Respondent property.

It is also ORDERED that each party shall bear its own costs of court.

IT IS SO ORDERED.

curred on September 11, 1985; March 18, 1988; July 24, 1988; and July 26, 1988.

Law enforcement testimony indicated that the property had a "reputation" for being a haven for drug dealers, but the Court cannot fairly characterize the testimony as being the true reputation within the community. The government did not produce evidence indicating that the general public considered the Stop Six property a location where drug abusers could purchase narcotics. The correct interpretation of the evidence is that the property had such a reputation within the law enforcement community.