UNITED STATES of America,
Plaintiff–Appellant,

v.

$277,000 U.S. CURRENCY, and One 1986
Dodge Ram Charger, Jalisco, Mexico,
Lic. # HWY 773, Defendants,

and

Ramon S. Montes, Claimant–Appellee.

No. 93–55448.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 5, 1994.

Decided Nov. 15, 1995.

**1492**

Michele C. Marchand, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellant.

Janet Sherman and Victor Sherman, Sherman and Sherman, Santa Monica, California; Gerson S. Horn, Beverly Hills, California, for claimant-appellee.

Before: D.W. NELSON, NORRIS, and BOGGS,* Circuit Judges.

BOGGS, Circuit Judge.

This case involves an important issue, one which undoubtedly occurs with some regularity, and yet one that appears to remain a question of first impression, at least so far as a complete examination is concerned. At times, the United States seizes property, especially cash, and is ultimately found to have no proper claim to the property. When the property must be returned to its owner, the question arises as to what extent may the owner recover an amount related to the loss of the use of the property in the interim. We hold that the government is not generally liable for damages or interest prior to judgment, because of sovereign immunity. However, we also hold that to the extent that the government has profited from use of the property, especially where it has (actually or constructively) earned interest on money, it must disgorge those earnings along with the property itself. We therefore reverse and remand for further proceedings consistent with this opinion.

I

The chronology of this case is somewhat tortuous, and is set out in greater detail below. In brief summary, local police seized approximately $277,000 in cash and a truck from Montes on October 13, 1987. This property was turned over to the United States government, which sought its forfeiture. After a long series of proceedings, including an appeal to this circuit and a remand, the district court held, on January 27, 1992, that the evidence supporting the government's claim should be suppressed, and that the money should be returned to Montes, "including interest thereon as provided by law from the date of seizure." The government did not appeal this order and, in fact, on March 31, 1992, the government itself proposed a clerical modification, which the judge adopted on April 1, 1992 (Appellee's S.E.R. 6–8). This modification, and the amended order, also contained the provision for interest. The government then made another effort to prevent the return of the money to Montes by moving, on June 30, 1992, to have the money returned to the Internal Revenue Service in the first instance, because of alleged tax liabilities. This motion was denied on July 30. Again, the government did not appeal this decision. Instead, on November 12, 1992, more than 9 months after the initial ruling ordering the return of Montes's property, the government moved for relief from judgment under Fed. R.Civ.P. 60(b)(1) and 60(b)(4). The motion stated that the government had now returned the property, but that there was no statutory authority for the government to pay prejudgment interest in any case, and especially not in a case of attempted forfeiture. Thus, the government reasoned, the United States has not waived its sovereign immunity to such claims. The district court denied the motion and this appeal followed.

■■■ We review a motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(1) for an abuse of discretion. *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 889 (9th Cir.1992); *Floyd v. Laws*, 929

---

* The Honorable Danny J. Boggs, United States Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

F.2d 1390, 1400 (9th Cir.1991). We review, *de novo,* the denial of a motion to set aside a judgment pursuant to Rule 60(b)(4), because the question is a legal one. *Retail Clerks Union Joint Pension Trust v. Freedom Food Center, Inc.,* 938 F.2d 136, 137 (9th Cir.1991). Whether the government enjoys sovereign immunity in a particular application is also a question of law, which we review *de novo. McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989).

## II

In broad principle, we agree with the government. The United States may be sued for damages under the Federal Tort Claims Act, but that is not the avenue the claimant pursued. A specific statute, 28 U.S.C. § 1961, provides for *post-judgment* interest, and the government has indicated that it has complied with the judge's order to the extent of paying the post-judgment interest. The question that remains is whether, in any action concerning the government, a person receiving a judgment may receive pre-judgment interest as well. The cases that discuss this issue have generally held to the contrary.

*Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), is a very strong statement of the rule that "interest cannot be recovered in a suit against the government in the absence of an express waiver of sovereign immunity from an award of interest." *Id.* at 311, 106 S.Ct. at 2959. *See also id.* at 315, 106 S.Ct. at 2962 ("interest cannot be recovered unless the award of interest was affirmatively and separately contemplated by Congress"); *Bernardi v. Yeutter,* 951 F.2d 971, 976 (9th Cir.1991).

Montes attempts to distinguish those cases by saying that here he was not originally a plaintiff. The government seized his truck and money, and he was summoned into court, rather than him trying to summon the government.

■ This argument is not persuasive. When sovereign immunity is at issue, the government is immune from a suit, whether couched as an original claim or as a counter

claim, unless it has waived its immunity. *United States v. Lockheed L–188 Aircraft,* 656 F.2d 390 (9th Cir.1979), also clearly stands for the proposition that a claimant "must demonstrate that the government has waived its immunity to the kind of claim it asserts. This is true of a counterclaim as well as an original suit." *Id.* at 393, citing *United States v. Finn,* 239 F.2d 679, 682 (9th Cir.1956).

Thus Montes does not have a general claim to receive interest (or damages). In fact, were we to support this claim by Montes, then he should also receive damages for the loss of use of the truck, even if it were simply sitting in a government pound during this time, and interest on the money, even if the government was retaining the physical cash as evidence.

■ However, not every payment of money by the government related to something it has seized can be characterized as a forbidden award of pre-judgment interest. For example, in *United States v. 1980 Lear Jet,* 25 F.3d 793 (9th Cir.1994), the government seized property subject to a mechanic's lien. The innocent lien holder was allowed to recover not only the basic amount of his lien, but also the costs normally allowed by state law, including statutory interest. We held that the government, in seizing the property, stood in the shoes of the former property holder and was subject to his liabilities under state law. We particularly noted that there was also no issue of sovereign immunity "because the government is not being required to pay interest," only to disgorge some of its share of the proceeds of seized property. *Id.* at 797. *See also United States v. Real Property Located at 41741 National Trails Way,* 989 F.2d 1089 (9th Cir.1993). Thus, while sovereign immunity will prevent a simple claim for pre-judgment interest, the government is not always free to profit from wrongly seized property without recourse by the owner.

## III

■ The tale of the particular cash in this case, and the treatment of cash in the Central District of California generally, is consid-

erably more complicated. In this case, the judge specifically directed, by order of June 28, 1988 (again prepared by the government), that the government "may negotiate ... and deposit [the money] in an interest-bearing account. . . ." Apparently there is no dispute that at the time all parties thought that this was exactly what would happen. Apparently it was, from time to time, the practice before 1987 for this to be done, and apparently it is again the practice, after 1992, for this to be done. Where a disputed *res* is capable of being put to use for someone, it makes no sense whatsoever that a pile of dollar bills should be left doing no good for anyone. Certainly in any normal commercial dispute over property, the disputed property would, as soon as practical, be placed in an escrow account to earn interest that would go to whoever was the ultimate winner. In fact, the judge's order specifically contemplated this peculiar type of prejudgment "interest" by noting that an account that "represents the defendant monetary instruments together with any interest accrued thereon shall be substituted as the *res* in this action." Order of June 28, 1988, at 3.

We have seen examples in the record and can also take judicial notice of the judicial practice in the Central District of California of ordering interest paid from the date of seizure on various assets.

However, events did not develop as all the parties contemplated. First, apparently the cash had already been "deposited into a Treasury Account" on December 2, 1987, more than six months before the judge's order. The exact nature and status of this account appear somewhat disputed. The only material in the record referring to it is an affidavit filed in November 1992 by the District Customs Director, which speaks in rather vague terms of "a Treasury account," that "I have been informed that interest does not accrue on amounts deposited in the Treasury," that "[i]t is my understanding that" matters were handled differently prior to 1987, and other hearsay material (Appellant's E.R. 9–10). In addition, the receipt for the

transfer of responsible custody from the Marshal's Service to the Customs Service (though the money had apparently been in the physical custody of Customs from the beginning) notes, as of June 30, or July 13, 1988, that the money is "in a Customs Treasury Account." R. 5. Thus, it appears to be the government's position that, despite the judge's Order, it was free to "negotiate" the currency, but not deposit the money in an interest-bearing account. We disagree.

From various sources and evidence, it clearly appears that this account is what is known as the Seized Asset Deposit Account, in the United States Treasury. This account is authorized by 28 U.S.C. § 524(c), which establishes a fund to hold assets after they have been forfeited [the Asset Forfeiture Fund, § 524(c)(1) ], and "holding accounts" for assets before forfeiture, § 524(c)(5). This has been described elsewhere as "a holding account for non-evidentiary cash." 1992 Annual Report of the Department of Justice Asset Forfeiture Program 87 (FY 1992 Financial Statement, Note 5). The Customs affidavit indicates that prior to 1987, money had generally been deposited in commercial banks, where interest would be earned and added to the *res*, but that allegedly because of criticism by the General Accounting Office, this practice had been changed. However, in our perusal of both the annual reports of the asset fund, and the reports of the General Accounting Office, we see no indication of any recommendation or directive that such funds not bear interest.

In fact, a GAO report of March 13, 1987, entitled "$ MILLIONS IN SEIZED CASH CAN BE DEPOSITED FASTER,"[1] which is probably the criticism referred to by the Customs affidavit, takes exactly the opposite tack. The document does criticize delays in holding cash "before [it is] deposited into designated U.S. Treasury accounts. The delays prevent the government from obtaining economic benefits from the idle cash. . . ." (page 2). In particular, the report states that the Customs practice of "depositing non-

---

1. Statement of Gene L. Dodaro, Associate Director, General Government Division, General Accounting Office, before the Subcommittee on Federal Spending, Budget, and Accounting, United States Senate Committee on Governmental Affairs, March 18, 1987. Document number GAO/T–GGD 87–7.

evidentary [sic] cash ... into interest bearing commercial bank accounts differs from the practice followed by the Department of Justice which deposits such cash into its Seized Asset Deposit Fund—a U.S. Treasury Account." (page 11). As the GAO points out, this difference is not simply one of physical location. The GAO report states:

We favor Justice's practice because it gets the money more quickly into a U.S. Treasury account, thus providing ... higher economic benefits to the government. Customs' lack of a Treasury Deposit account had led to sporadic depositing of pre-forfeited cash into commercial bank accounts at below-Treasury interest rates.

*Ibid.* The report goes on to note various examples of banks paying interest at "3.6 to ... 7.75 percent" while during the same period, the "U.S. Treasury rate ... varied from 6 to 19 percent." In other words, despite the Treasury affidavit, the government's accounting arm clearly recognized that depositing cash into a Treasury account was favored precisely because it did, in effect, earn interest for the government.

Further, whatever the formal status of the funds, or of any agreement between two arms of the federal government, the United States Treasury on the one hand and the Justice Department or the Customs Service on the other, it is clear that the translation of the cash from sterile paper into a deposit fund in fact redounds to the direct benefit of the federal government, in a manner that is completely equivalent to the earning of interest.

Although government money, in a conceptual sense, may be segregated into various funds, such as the Highway Trust Fund or the Airport Improvements Fund, from the point of view of government financial management, all financial assets in the hands of the government are a means by which the government does not have to borrow equivalent funds. Thus, it has been a commonplace in government budgeting for over a decade that "deficit reduction" is aided by not spending money, even from segregated funds such as the Highway Fund, because the government may then avoid borrowing and paying interest on an exactly equivalent amount.

Thus, the act of placing Montes's money in any "Treasury account" represented an equivalent sum that the government was not required to borrow. This will always be the case, at least during any time there is government debt.

As federal budget documents have consistently explained, the federal deficit is essentially financed, in part, by any non-interest bearing balances held by the Treasury. *See, e.g., Budget for Fiscal Year 1983,* page 6–26 ("Since trust fund surpluses for the most part have [not been] held as cash assets, ... the deficit ... must be financed primarily by selling Federal debt."); *Id.* at page 7–16 ("Certain accounts outside the budget, known as deposit funds, are established to record amounts held in suspense temporarily.... Such transactions affect Treasury's cash balances even though they are not a part of the budget. To the extent that deposit fund balances are not invested, changes in the accounts are treated as a means of financing").

The case of *United States v. $1,322,242.58,* 938 F.2d 433 (3rd Cir.1991), illustrates that the Seized Assets Deposit Fund is simply an accounting entry. There, a check for over $1.3 million was seized and, as the court noted, "deposited ... in the Justice Department's Seized Asset Deposit Fund, an account with the United States Treasury." *Id.* at 435. The court went on to say "the *res* at issue here is merely an entry in a Justice Department account with the United States Treasury. In other words, the *res* is an obligation on the part of the Treasury to disburse the specified sum to the Department of Justice." *Id.* at 437–38.

The nature of the transaction between Treasury and Justice, two arms of the federal government, is simply a matter of internal allocation of budget authority, and of administrative convenience. In 1992, the government decided that Treasury would formally pay interest to Justice on these amounts. 1992 Annual Report, page 87, Note 6. However, the government's need to borrow external funds, and to pay taxpayer money as interest to private debt holders, was unaffected by that decision. Before that decision,

Treasury had the use of the money, and did not need to borrow an equivalent amount from outside sources. Thus, the Treasury account was correspondingly larger, and the Justice account correspondingly smaller, by the amount of interest not paid. When a different decision was made, and the Treasury issued securities to Justice in the amount of the fund, Treasury no longer had the use of the account, but it did have the funds from the issuance of the corresponding amount of securities. Again, it did not have to borrow from the outside world, even though interest was now being credited to the Justice account and debited from the United States Treasury. This shifting from one pocket to another cannot obscure the fact that in either case, the government obtained tangible and calculable financial benefit from the retention of Montes's money. This is the money that is constructively part of the *res,* and that must be returned to Montes.

The action of the court below in stating that the interest earned on the money in an interest-bearing account would become part of, and would be substituted for (along with the original amount) the *res* itself is fully in accord with common sense. If the government seized, for example, a pregnant cow[2] and was ultimately found not to be entitled to the cow after it had given birth, it could hardly be contended that the government had fulfilled its duty by returning the now-barren cow, but retaining the calf.

Thus, we hold that to the extent the funds were deposited in the Treasury as of June 1987, those funds should be considered as constructively earning interest at the government's alternative borrowing rate at all times from then until the rendering of judgment in this case. Such amounts, in accordance with the judge's order and past practice, become part of the *res,* to be returned with the *res* to the claimant.

■ The better practice would be for the court, the claimant, and the government to be clear and consistent on the status of funds, and the conditions under which they will be maintained and augmented. It is little short of scandalous that the government could prepare all of the documents and orders concerning the use of the money for more than five years, in accordance with many rulings in which it acquiesced, and then come into court nearly a year after judgment and point out that (1) it was ignorant of the actual status of the money in 1988; and (2) it either intended to, or neglected to report that it had, both "negotiated the instruments" and failed to place them in what it considered an interest-bearing account. District courts certainly have ample power to make orders for the maintenance of assets, as a condition of leaving them in the control of the government. Such conditions would not violate the government's sovereign immunity from suits for damages, but would simply be a reasonable condition that a court could impose, as an alternative to, for example, changing the status quo by returning custody of the funds to the claimant and directing the claimant to place in an escrow subject to the ultimate outcome.

We note that in *United States v. Real Property Located at 185 Hargraves Drive,* 928 F.2d 472 (1st Cir.1991), the court discussed the provisions for releasing seized property on bond. There can be little doubt that a district court would be justified in releasing money on bond, with appropriate conditions, such as the money being placed in an appropriate escrow account. Again, under those conditions there can be little doubt that the claimant, if ultimately determined to be entitled to the funds, would not be required to disgorge to the government the interest earned on the amount while it was held in the escrow account. In the absence of a ruling such as we make today, all district courts might be inclined to issue such orders, in order to effect their clear intent in cases such as this, in the face of government opposition and confusion.

■ It is interesting that in the case of *United States v. $12,248,* 1990 WL 59183 (N.D.Cal.1990), the government made no objection to the court's award of prejudgment interest, as measured by "the interest which has accrued on the defendant currency."

---

**2.** E.g., Rose II of Aberlone. *See Sherwood v. Walker,* 66 Mich. 568, 33 N.W. 919 (1887), cited in *In re Florida v. Treasure Salvors, Inc.,* 621 F.2d 1340, 1349 (5th Cir.1980).

The government appealed the denial of forfeiture, but apparently did not raise the interest issue. 957 F.2d 1513 (9th Cir.1992). While the government is not estopped by its dereliction or acquiescence in the past, this case is another indication that, aside from adventitious technical reasons, there is no reason for the parties and the government to squabble over the interest in cases such as this. We believe the law is reasonably clear: the government is not liable to suit for inchoate interest, as an item of damages in a forfeiture action. However, as a matter of practice, assets amenable to such treatment should be put to use, with their increase accruing ultimately to whatever party is found to have the right to the property. Where such a course has been followed, actually or constructively, as in this case, the government will not be allowed to retain the fruits, once the tree has been ordered returned to its owner.

In *United States v. Kingsley*, 851 F.2d 16 (1st Cir.1988), a case in many ways similar to ours, the owner was able to recover accrued interest, though under another theory. There, seized assets were ultimately determined to be forfeitable, but the government had agreed that such amounts, even if forfeitable, could be applied against the claimant's tax obligations. The funds were, per court order, supposed to be deposited into an interest-bearing account, but the government did not do so. As noted there, and applicable here as well, "the government offers no satisfactory explanation for its failure to place the funds in an interest-bearing account...." *Id.* at 19. The court there noted "the irrationality of a policy ... [that would] establish a non-interest-bearing account.... [T]he burden of any interest due at the conclusion of the proceedings must fall on the government and, by extension, the taxpayer.... [W]e hold that the government does not possess unbridled discretion to pursue so pointless a policy." The court there decided that it would "give Kingsley the benefit of the bargain he thought he made and award him the interest that would have accrued from the moment his reliance reasonably began, that is, from the district court's oral order ... to place the funds in an interest-bearing account."

Here, similarly, the order was of such a nature that the defendant could reasonably rely on its being carried out, and thus would believe that he need not undertake actions such as those outlined above for "release on bond" in order to ensure that the government would not be receiving the fruits of his money, even if it were ultimately determined to belong to him.

The cases cited by the government in an effort to avoid liability are fairly easily distinguishable. In *United States v. 2,116 Boxes of Boned Beef*, 726 F.2d 1481 (10th Cir.1984), the issue was simply a straightforward application of the *Shaw* rule. The plaintiff sought damages for the diminished value of the boned beef (and offal) during the seizure period. As the court pointed out, this claim, brought in recoupment, was not a proper action to achieve this purpose. When the boned beef was returned, there was no money owing by the plaintiff against which its alleged damages could be offset. As the court noted, the government, by bringing a forfeiture suit "does not waive immunity as to claims of a different form or nature than that sought by it (the government)." 726 F.2d at 1489, (citing *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982)). Thus, this case does stand for the proposition already expounded above that the government's sovereign immunity is not diminished by the fact that Montes is seeking interest by way of counterclaim, rather than by direct action. Sovereign immunity is equally applicable, based on the nature of the claim, not on the sequence or the nomenclature denominating the adversaries as "plaintiff" and "defendant."

*United States v. One 1979 Cadillac Coupe De Ville*, 833 F.2d 994 (Fed.Cir.1987) is a similar case. There the district court ordered the return of a seized automobile, and also awarded as damages the amount by which the vehicle's value decreased while in government custody. The Federal Circuit reversed, citing *2,116 Boxes* and noting that 28 U.S.C. § 2465 does not authorize an award of damages for depreciation while an object is held for seizure and then returned pursuant to court order. *Id.* at 999.

Both of these cases involve loss of value that produced a gain to no one. The government did not cause the depreciation by *making use of* the car or the beef. In such circumstances, finding the government liable for depreciation would be imposing exactly the type of consequential damages for which the government is immune, absent a waiver of sovereign immunity.

By contrast, in our case there is in fact a benefit from the use of the money, which must be allocated either to the government or the claimant. There is no element here of forcing the government to pay for damage it has done, only that it must disgorge benefits that it has actually and calculably received from an asset that it has been holding improperly.

Thus, the district court did not abuse its discretion in denying the government's motion under Rule 60(b)(1). Nor did it err as a matter of law to the extent that sovereign immunity does not prevent the government's liability for disgorging the interest it earned from the date it deposited the cash in the Treasury.

The case is REVERSED and REMANDED for a calculation in accordance with this opinion.