# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 00-2754

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAND MOTORS,

*Defendant-Appellant,*

*and*

SHERWIN YELLEN, *et al.*,

*Claimants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 91 C 2796—**George W. Lindberg**, *Judge.*

ARGUED DECEMBER 5, 2001—DECIDED SEPTEMBER 27, 2002

Before COFFEY, RIPPLE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* As an offshoot of an investigation into drug-related money laundering, the United States filed a civil forfeiture action against Rand Motors, along with its owners and operators, Sherwin and Martin Yellen. After a probable cause determination, the government seized cash and property from Rand Motors and from Sherwin Yellen (collectively Rand). More than five years later, the government entered into a settlement

agreement with Rand, under which the United States agreed to dismiss the prosecution and keep $250,000 of the seized property and to return the balance to Rand. The district court entered a dismissal order pursuant to the settlement agreement, ordering that $250,000 be paid to the government from the assets seized and that the property, along with $207,173.91, be returned to Rand; it retained jurisdiction over the case to enforce the terms of the settlement agreement. Three years later, Rand returned to the district court, armed with letters from an Assistant United States Attorney (AUSA), arguing that the government had agreed to pay interest on the balance due to Rand, notwithstanding the silence of the settlement agreement on this point. The district court denied Rand's petition for interest. We agree that the government is not required to pay Rand interest, and we thus affirm the district court's judgment.

## I

On May 8, 1991, the government filed a forfeiture complaint against Rand. It alleged that Rand laundered money by purchasing automobiles with proceeds from illegal drug trafficking. The district court issued warrants of seizure and monition against Rand Motors. The following day, the United States Marshal seized real estate, bank accounts, and automobiles from Rand Motors, along with the keys to safe deposit boxes, financial records and $64,256 in cash from Sherwin Yellen's home. On January 22, 1992, the government itemized the property seized in an amended complaint and stated that it had seized a total of $507,173.91 in cash. Rand filed claims verifying an interest in the seized property, and $50,000 was released immediately to Rand's attorney for legal fees.

In September 1996, five years after the government seized the assets and on the eve of trial, the parties agreed

to a settlement. The settlement agreement provided that "the sum of $250,000 shall be paid to the United States from the assets seized." The agreement did not mention interest. It said only that "the United States agrees that all property seized pursuant to warrants of seizure and monition shall be released 'where is and as is' to Rand."

The district court dismissed the complaint in accordance with the settlement agreement. Its order itemized the property that would be returned to Rand, ordered that Rand was entitled to "U.S. currency in the amount of $207,173.91" and ordered that $250,000 be paid to the government from the seized assets. The dismissal order also determined that Rand was entitled to $175,351.04 from Rand Motors's accounts receivable. In February 1997, the government released a total of $382,524.95 to Rand. The parties agree that this sum did not include interest.

Over a year later, in June 1998, Rand sent a letter to the AUSA who had represented the government in the forfeiture action. In the letter it requested interest on the released assets. The AUSA responded in a June 1998 letter. She first expressed the view that Rand was not legally entitled to interest, but she then went on to say that notwithstanding that fact, the government would pay a portion of the interest ($74,793.36). Rand's counsel met with the AUSA along with other supervisory personnel in the United States Attorney's office. After those meetings, the government decided that it would not pay any interest. On February 2, 2000, Rand responded by filing a petition for interest in the district court.

The district court denied Rand's petition, noting that the legal authority on the issue was unhelpful, but that the settlement agreement and the dismissal order controlled, and neither provided for interest. First, the district court relied on the "where is and as is" phrase in the settle-

ment agreement, which appeared to exclude interest as a matter of plain language. The district court also found that the clause in the agreement that stated that the sum of $250,000 was to be paid to the government "from the assets seized" contained not a hint of an obligation on the government to pay interest to the claimants on the balance. Finally, the parties' failure to mention interest in the settlement agreement convinced the district court that Rand was not entitled to any interest. This appeal followed.

## II

As an initial matter, both parties argue that the other has waived its argument regarding interest. Rand argues that the government waived any objection to interest payments when its AUSA agreed to pay interest in her letter. But this is not a waiver argument. If it is anything, it is an estoppel argument. Waiver is the intentional relinquishment of a known right and it precludes appellate review. *United States v. Richardson*, 238 F.3d 837, 840 (7th Cir. 2001). In this case, the government never in any way waived its argument against interest in a formal proceeding, nor did it forfeit the argument by failing to raise it before the district court. *United States v. Chay*, 281 F.3d 682, 685 (7th Cir. 2002). But at oral argument, Rand explicitly stated it was not making an estoppel argument. (In itself, that was a wise decision, given the fact that this court has stated that equitable estoppel may only lie against the government in a small set of cases: "when the traditional elements of estoppel are shown and there is affirmative misconduct on the part of the government." *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992).) Rand could attempt to submit the AUSA letters in support of its petition for interest, which it did, but the government is still entitled to respond. Furthermore,

as the government points out, Rand actually forfeited its own waiver argument by not presenting it to the district court first. This court has repeatedly stated that it will not review arguments never presented to the district court. *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989).

The government also argues waiver. It maintains that Rand waived any interest argument by failing to present it to the district court in a timely manner—at a minimum, by filing a motion under Rule 60(b) in the original proceeding, rather than by petitioning the district court for interest years later. (This is really a forfeiture argument; the government is not claiming that Rand affirmatively took steps to disclaim such an argument.) But the government never presented this argument to the district court. *Id*. Moreover, as long as Rand is not arguing that it disagrees with either the settlement agreement or the district court's initial order dismissing the forfeiture action, Rand is entitled to petition for interest. On appeal, Rand maintains that the government either did not abide by the settlement agreement or that it altered the agreement. It may ask the district court to enforce the agreement according to its terms. Therefore, the arguments based on waiver and forfeiture of both sides are without merit and we can proceed to the merits.

We review a district court's interpretation of a settlement agreement *de novo*, to the extent there are issues of law to be resolved by this court. *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir. 1998). Rand presents several arguments in an attempt to convince this court that the parties intended that it should receive interest along with the return of seized assets. We will not consider whether in the abstract the United States has some duty to pay interest on seized funds that are later returned. Here, the parties entered into an agreement governing the disposition of

those assets, and it is this agreement, along with the district court's dismissal order that governs Rand's rights.

A settlement agreement is essentially interpreted as a contract. In this case, federal law controls the interpretation of the agreement, *United States v. Seckinger*, 397 U.S. 203, 209 (1970), and we therefore apply federal common law rules of contract interpretation. Under those rules, we interpret the settlement agreement "in an ordinary and popular sense as would a person of average intelligence." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998) (quoting *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996)). In doing so, we attempt to construe a contract to give full effect to the intention of the parties. *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 455 (7th Cir. 1991); *Alliance to End Repression v. City of Chicago*, 742 F.2d 1007, 1013 (7th Cir. 1984) (en banc). We apply an objective standard of reasonableness to determine the meaning of the settlement agreement. 2 Farnsworth on Contracts § 7.9 (2d ed. 1998). From that standpoint, this agreement obligates the government to pay a sum certain—the balance after it retained $250,000—and nothing more. Recognizing that, Rand's first effort is to convince us that the agreement suffers from an extrinsic ambiguity.

Under the doctrine of extrinsic ambiguity, a party may introduce objective evidence to establish an ambiguity. See, *e.g.*, *Raffles v. Wichelhaus*, 2 H. & C. 906 (Ex. 1864) (contract specifying carriage on the ship *Peerless* was ambiguous where objective evidence showed that there were two ships of that name sailing from the same port). As this court has noted, "[a] contract might seem clear only because the judicial reader didn't understand the commercial context of the contract—the nonstandard verbal usages current in the activity out of which the contract arose." *Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc.*, 279 F.3d 553, 556 (7th Cir. 2002).

Rand is trying to fit the settlement agreement into that mold. Although it acknowledges that the agreement does not specifically use the word "interest," Rand argues that silence equals ambiguity here. In the absence of the word "interest," the contract could be interpreted to mean either that no interest at all was due, or that no interest in addition to the amount necessary to preserve the value of the property was due. See *Delaney v. Commissioner*, 99 F.3d 20, 24 (1st Cir. 1999). Because the settlement agreement specifically stated only the amount the government could keep ($250,000), Rand argues that the unspecified balance to be returned to it could have included interest.

Rand points to the phrase "where is and as is" to show that the settlement agreement is at least ambiguous, and perhaps even explicitly considers interest. We do not read it that way. The phrase "where is and as is" is neither ambiguous nor confusing. While the government returned money to Rand, it also returned seized property. In the commercial context, the phrase "where is and as is" is recognized as a disclaimer of implied warranties of fitness. U.C.C. § 2-316 (1998). Indeed, the relevant passage of the agreement reads: "Upon receipt of the funds in settlement of this matter, the United States agrees that all property seized pursuant to warrants of seizure and monition shall be released 'where is and as is' to Rand." Rand has provided nothing to suggest that the phrase "where is and as is" implies anything other than its ordinary use—describing the condition of the property. Rand similarly points to the phrase in the agreement that states that $250,000 would be paid "from the assets seized." Again, Rand offers nothing that would lead this court to believe that the specific mention of the sum $250,000 for the government really meant that the government would net whatever sum less than $250,000 remained after it paid interest on the $207,173.91, or on the full

$382,524.95 that it tendered to Rand. The only ambiguity in the phrase is the one created by Rand's speculation. That is not enough; "the party challenging the literal meaning must present *objective* evidence, not just his say-so, that the contract does not mean what it says." *Air Line Pilots Ass'n, Int'l*, 279 F.3d at 556 (emphasis in original).

Rand maintains that even if the language of the settlement agreement is not ambiguous, the letter sent by the AUSA shows that the parties contemplated interest in the settlement agreement, and that this is a rare instance where a party has evidence that this meaning of the settlement agreement was shared by both parties. True, the AUSA indicated that some interest would be paid. However (and apart from the question of whether she had any authority to bind the United States to this obligation), these letters, written over a year after the settlement agreement was signed, do not indicate whether the parties anticipated interest when they entered into the settlement agreement.

Rand finds support for the idea that there was a contemporaneous understanding in favor of its right to interest in a decision of the Ninth Circuit Court of Appeals to that effect, *United States v. $277,000 U.S. Currency*, 69 F.3d 1491 (9th Cir. 1995). Rand acknowledges that a circuit split developed on this point later, compare *United States v. $7,999.00 in U.S. Currency*, 170 F.3d 843 (8th Cir. 1999) and *United States v. $30,006.25 in United States Currency*, 236 F.3d 610 (10th Cir. 2000) with *$277,000 U.S. Currency* and *United States v. $515,060.42*, 152 F.3d 491 (6th Cir. 1998), but it argues that the parties must have intended to follow the only directly pertinent decision. In *$277,000 U.S. Currency*, the Ninth Circuit held that the interest earned on interest-bearing accounts becomes part of the "*res*" to be returned to the claimant. *$277,000 U.S. Currency*, 69 F.3d at 1496.

But *$277,000 U.S. Currency* was not the only potentially relevant case in 1996. Ten years earlier, the Supreme Court had decided *Library of Congress v. Shaw*, 478 U.S. 310, 316 (1986), which relied on the rule that "federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates that result," to hold that there was no such authorization for interest on attorneys' fees and costs under Title VII. It is just as reasonable to think that the government would have seen *Shaw* as the governing authority in this closely analogous area. A reasonable extension of *Shaw* to this situation would permit the payment of interest only if there is an express agreement to pay it in a contract or an express waiver of sovereign immunity in a statute. *Id.* at 317; see also *$7,990.00 in U.S. Currency*, 170 F.3d at 845. (Later, Congress explicitly waived sovereign immunity for measures designed to preserve the value of forfeited property pending litigation in the Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 18 U.S.C. § 981(g)(6) (2002); the time period in dispute for this case, however, is 1991-1996.) This court need not decide which view of interest on improperly acquired funds is correct; what is important is that there is no reason to suppose that the parties might have shared the understanding of the Ninth Circuit. Of course the government could consent to pay interest by contract, but it must expressly do so. *Shaw*, 478 U.S. at 317. Nowhere in the settlement agreement does the government agree to pay interest on the *"res."* Given the history of separating damage awards from the penalty of interest, had this been contemplated, the parties surely would have expressly included interest in the agreement.

Rand also cannot prevail on the theory that the AUSA letter amended the settlement agreement. First of all, the letter does not purport to amend the settlement agreement; if anything it represents an ongoing dialogue be-

tween the government and Rand. Furthermore, while Rand relies heavily on the AUSA's letter, the AUSA did not have authority to offer Rand prejudgment interest without the consent of her supervisors. See 28 C.F.R. Pt. 0, Subpt. Y, App. "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947). In this case, the authority lies with the United States Attorney for the Northern District of Illinois unless delegated. This remains true even if the AUSA is not aware that her authority is limited. *Id.*; see also *United States v. Killough*, 848 F.2d 1523, 1526 (11th Cir. 1988). Therefore the AUSA letter did not modify the settlement agreement.

### III

Rand believes it is entitled to an additional $74,793.36. It is not: neither the language of the settlement agreement nor the letters from the AUSA created such an entitlement. We AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*