152 F.3d 491
 UNITED STATES of America, Plaintiff-Appellant (95-6579; 97-5016),
v.
$515,060.42 IN UNITED STATES CURRENCY, Defendant-Appellee,
Ralph E. White; E.M. Jellinek Center, Inc., Claimants-Appellees.
UNITED STATES of America, Plaintiff-Appellee/Cross-Appellant (96-6175),
v.
$515,060.42 IN UNITED STATES CURRENCY; Virginia Hurst, Defendants,
Ralph E. White; E.M. Jellinek Center, Inc.,
Claimants-Appellants (96-6057)/Cross-Appellees.
 Nos. 95-6579, 96-6057, 96-6175 and 97-5016.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 21, 1997.
Decided May 26, 1998.
Rehearing Denied Aug. 14, 1998.
 
 Robert E. Simpson (argued and briefed), Office of the U.S. Attorney, Knoxville, TN, for United States of America in Nos. 96-6057 and 96-6175.
 Robert E. Simpson (argued and briefed), Office of the U.S. Attorney, Carl K. Kirkpatrick, U.S. Atty., Knoxville, TN, for United States of America in Nos. 95-6579 and 97-5016.
 Herbert S. Moncier (argued and briefed), Knoxville, TN, for Ralph E. White.
 James S. MacDonald (argued and briefed), Dunn, MacDonald & Coleman, Knoxville, TN, for E.M. Jellinek, Inc.
 Before: KEITH, BOGGS and COLE, Circuit Judges.
 OPINION
 COLE, Circuit Judge.
 
 
 1
 This consolidated appeal arises from a civil forfeiture proceeding in which the district court dismissed the Government's action against certain currency seized as part of a federal investigation of Tennessee bingo game operations based on the Government's failure to file the action within the five-year statute of limitations period. The Government appeals that decision as well as the district court's award of interest on the seized currency. The Government additionally challenges the claimants' standing. The claimants appeal the district court's denial of attorney's fees. For the reasons that follow, we affirm the district court in part and reverse and remand in part.
 
 FACTS AND PROCEEDINGS BELOW
 
 2
 This case arises out of a seizure of currency which occurred as part of a federal investigation of bingo game operations in Tennessee. On October 17, 1989, pursuant to a federal search warrant, agents of the Internal Revenue Service ("IRS") and the Federal Bureau of Investigation ("FBI") searched the residence of Virginia Hurst, a target of the investigation, in Knoxville, Tennessee. Hurst operated bingo games in the Knoxville area for several charitable organizations, which were exempted by statute from Tennessee's gambling laws.[1] In the search of her home, agents seized $702,926.81 in United States currency[2] and on March 14, 1994, the Government initiated a civil forfeiture action against $515,060.42 of the seized currency.[3] In its complaint, the Government alleged that the $515,060.42 in United States currency was used to commit and facilitate the commission of an illegal gambling business in violation of Tennessee and federal law and that the defendant currency was thus subject to forfeiture.
 
 
 3
 The multi-target federal investigation of Tennessee bingo operations began in the spring of 1988. It produced several indictments, as well as the 1990 convictions in the United States District Court for the Middle District of Tennessee of Virginia Hurst, Sam T. Burnett, a former member of the Tennessee legislature, and Eddie E. Schutt. See United States v. Hurst, 951 F.2d 1490 (6th Cir.1991) (affirming convictions). Hurst, Burnett and Shutt were convicted of conspiracy to conduct an illegal gambling business as well as the substantive violation of conducting an illegal gambling business during late 1986 and early 1987; Burnett was also convicted of mail fraud. Pursuant to a plea agreement, Hurst was also convicted in March 1993 in the United States District Court for the Eastern District of Tennessee of conducting illegal gambling operations from about February 1987 through September 1987. It was not until one year after this second Hurst conviction that the Government initiated the underlying forfeiture action.
 
 
 4
 Back in February 1985, Hurst began operating bingo games for one of the claimant-appellants, E.M. Jellinek Center, Inc. ("Jellinek" or "the Jellinek Center"), a not-for-profit corporation in existence since 1971 that is involved in the rehabilitation of chemically dependent men. Hurst operated bingo games as often as six nights per week. The other claimant in this case, Ralph Edward White ("White" or "Eddie White"), lived at Hurst's residence and worked for Hurst "calling" bingo games. At the end of the night when bingo games were over, Hurst would take the bingo proceeds home with her. After determining Jellinek's proceeds, Hurst would turn over Jellinek's share of the proceeds (including cash and checks) to Frank Kolinsky, the executive director of the Jellinek Center.
 
 
 5
 Grand jury testimony was taken in the fall of 1988 as part of the previously mentioned federal investigation. Among those who testified before the grand jury in September 1988 were Kolinsky, who presented to the grand jury five banker boxes containing all of Jellinek's business records related to Hurst's bingo operations; and White, who gave extensive testimony about, inter alia, the Jellinek bingo operations, his role, Hurst's management role, and how the money was handled, including the fact that Hurst consistently took bingo proceeds home and kept them at her residence.[4] Kolinsky also testified regarding Hurst's activities in conducting bingo for Jellinek. Kolinsky testified to the grand jury that Hurst was in charge of the entire operation of the bingo games which generated funds for Jellinek. He also answered questions regarding the handling of proceeds, payment of bingo workers, the operator's integrity and financial transactions related to the bingo operation.
 
 
 6
 FBI and IRS agents interviewed various individuals in 1988, prior to the taking of grand jury testimony. These interviews included Virginia Hurst, Dorothy Varnell and Jim Long, a bingo products supplier and former bingo lobbyist. Long gave wide-ranging information concerning his knowledge of various East Tennessee bingo operations. Long explained that Hurst was one of the most successful bus-trip coordinators for the bingo games at the North Carolina Cherokee Indian reservation and that she was part of a plan to secure a state bingo permit for a new East Tennessee bingo operation under the name of a scholarship fund which was, in actuality, a planned "storefront" bingo operation. According to Long, Hurst was responsible for getting the operation up and running and for its management. He also explained her management role in several bingo operations. He additionally stated to investigating agents that during 1985 and 1986, Hurst paid Long $500 per month in cash skimmed from bingo games. Long also related Dorothy Varnell's role in falsifying a state bingo permit application, and Varnell herself also offered that story in her own interview with agents. Hurst was interviewed twice and the interviews covered her management role in several bingo operations. In addition, in August 1988, IRS agents taped (with the consent of one of the parties) at least two conversations between Varnell and Hurst, in which the two discussed their falsification of information on the application for a state bingo permit and the subpoenaing of grand jury witnesses, including Varnell. Varnell also testified to the grand jury in September 1988 regarding the events surrounding the bingo permit application.
 
 
 7
 In August 1988, the Government was aware that Hurst's residence was robbed of a sum of money that month. The Government was also aware at the time that the grand jury was convened that Hurst was robbed one evening of $5000 in cash while leaving a bingo site.
 
 
 8
 At the forfeiture hearing, Karen Bjorkman, an IRS special agent involved in the investigation whose affidavit supported the search warrant, testified that by the fall of 1988, she knew that a number of bingo operators were skimming money from illegitimate bingo games and were keeping at their residences skimmed cash and records that could be used in financial investigations to determine the total amount of income not reported to the IRS. Bjorkman also testified in the forfeiture hearing that she knew in September 1988, as a result of the grand jury testimony that proceeds were being taken to Hurst's residence nightly, that money and records would likely be found at the residence.
 
 
 9
 Following the Government's filing of a complaint against the defendant currency in March 1994, the claimants in this case, the Jellinek Center and Eddie White, filed verified claims. The district court set the forfeiture action for trial and selected a jury, but prior to the start of trial in early October of 1995, the district court conducted a hearing addressing the claimants' assertion that the statute of limitations barred the Government's action. It concluded that the five-year statute of limitations did indeed bar the action and dismissed the action. The district court reasoned that the Government had discovered the offenses by September 1988 and thus the five-year limitations period had expired.
 
 
 10
 Following its dismissal on statute of limitations grounds, the district court also decided issues raised on Fed.R.Civ.P. 59(e) motions by the parties for reconsideration or relief from judgment. The claimants filed a Rule 59(e) motion for "pre-judgment interest" on the seized funds as well as for attorney's fees. The district court granted the interest and denied the attorney's fees. In addition, the district court summarily denied the Government's Rule 59(e) motion to reconsider, in which, along with the issues already mentioned, the Government raised the issue of the claimants' standing. The parties subsequently appealed and cross-appealed to this court. The district court stayed the return of the seized currency pending the Government's appeal to this court.
 
 DISCUSSION
 I. The Claimants' Standing
 
 11
 We address first the issue that the Government raised to the district court last: the claimants' standing.[5] Following the district court's dismissal of the forfeiture action on statute of limitations grounds, the Government raised, inter alia, the issue of the claimants' standing in a Fed.R.Civ.P. 59(e) motion. The Government argues that the district court erred in denying its Rule 59(e) motion. We typically review such denials for an abuse of discretion, but where reconsideration of summary judgment was sought, as it was here, we conduct a de novo review. See National Leadburners Health and Welfare Fund v. O.G. Kelley & Co., Inc., 129 F.3d 372, 374 (6th Cir.1997); see also, e.g., United States v. 37.29 Pounds of Semi-Precious Stones, 7 F.3d 480, 483 (6th Cir.1993) (noting that a claimant's standing to challenge a forfeiture is a legal question reviewed de novo). The Government contends, as it did before the district court, that the two claimants never demonstrated a sufficient property interest in the currency such that they had standing to contest the forfeiture.
 
 
 12
 In order to contest a governmental forfeiture action, claimants must have statutory standing through compliance with Supp. Admiralty and Maritime Claims R. C(6), as well as the Article III standing required for any action brought in federal court. See United States v. Currency $267,961.07, 916 F.2d 1104, 1107 (6th Cir.1990). With respect to Article III standing, which is the subject of the challenge here, a claimant must have a colorable ownership, possessory or security interest in at least a portion of the defendant property. See United States v. 16510 Ashton, 47 F.3d 1465, 1470 (6th Cir.1995); Currency $267,961.07, 916 F.2d at 1107; United States v. $321,470.00, U.S. Currency, 874 F.2d 298, 303-04 (5th Cir.1989); United States v. One 1952 Model Ford Sedan Automobile, 213 F.2d 252 (5th Cir.1954). Article III's standing requirement is thereby satisfied because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property. See United States v. Contents of Accounts Nos. 3034504504 and 144-07143, 971 F.2d 974, 985 (3d Cir.1992) (citing Warth v. Seldin, 422 U.S. 490, 498-502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). A claimant need not prove the merits of his underlying claim, see Semi-Precious Stones, 7 F.3d at 483, but he must claim a facially colorable interest in the seized property. See 16510 Ashton, 47 F.3d at 1470; United States v. $122,043.00 in U.S. Currency, 792 F.2d 1470, 1473 (9th Cir.1986).
 
 
 13
 Colorable claims which confer standing include the most obvious type of interest in seized property, an ownership interest. Id. A property interest less than ownership may also be sufficient to create standing. See, e.g., U.S. v. Currency Totalling $48,318.08, 609 F.2d 210, 214 (5th Cir.1980) (holding that valid assignee has standing to challenge forfeiture). Possessory interests may be sufficient to bestow standing on a claimant to contest a forfeiture. See, e.g., Currency $267,961.07, 916 F.2d at 1107; United States v. 717 So. Woodward St., 2 F.3d 529, 535 n. 3 (3d Cir.1993); United States v. Amiel, 995 F.2d 367, 371 (2d Cir.1993); United States v.1977 Porsche Carrera 911, 946 F.2d 30, 33 (5th Cir.1991); United States v. 116 Emerson St., 942 F.2d 74, 78 (1st Cir.1991); United States v. $38,000.00 in U.S. Currency, 816 F.2d 1538, 1544 (11th Cir.1987) (finding that because bailee has a possessory interest in bailed currency, bailee-claimant has standing); $122,043, 792 F.2d at 1473 n. 5 (collecting cases); United States v. 1982 Sanger 24' Spectra Boat, 738 F.2d 1043, 1046 (9th Cir.1984); United States v. Wright, 610 F.2d 930, 939 (D.C.Cir.1979). However, due to concerns about "straw man" transfers, "naked possession" claims are insufficient to establish standing. When confronted with mere physical possession of property as a basis for standing, we require some explanation or contextual information regarding the claimant's relationship to the seized property. See United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1058 (9th Cir.1994); see also, e.g., United States v. $321,470.00 U.S. Currency, 874 F.2d 298, 301, 304 (5th Cir.1989) ("a courier carrying cash from an unknown owner to an unknown recipient, resolute in his determination to give no explanation except that he was asked to transport cash, the ideal mule for drug traffickers, must be prepared to demonstrate that he has a lawful possessory interest. Unexplained naked possession of a cash hoard in the factual setting of this case does not rise to the level of the possessory interest requisite for standing to attack the forfeiture proceeding."); Mercado v. U.S. Customs Service, 873 F.2d 641, 644 (2d Cir.1989) ("Possession ... means more than mere custody."). The assertion of simple physical possession of property as a basis for standing must be accompanied by factual allegations regarding how the claimant came to possess the property, the nature of the claimant's relationship to the property, and/or the story behind the claimant's control of the property. This requirement derives from a common concern for "straw man" transfers of property from criminal defendants to third parties and subsequent assertions of ownership by claimants who lack a legal interest in the property subject to forfeiture. See United States v. 526 Liscum Dr., 866 F.2d 213, 216 (6th Cir.1989); $321,470.00, 874 F.2d at 303-04.[6]
 
 
 14
 To contest a forfeiture action, an individual customarily bears the burden of demonstrating an interest in the seized item sufficient to satisfy the court of his standing as a claimant. See, e.g., 526 Liscum Dr., 866 F.2d at 216; United States v. $47,875.00 in U.S. Currency, 746 F.2d 291, 293 (5th Cir.1984). However, because the fundamental requirement is that claimants have at least a facially colorable property interest in the proceedings sufficient to satisfy Article III's "case-or-controversy" requirement, $321,470, 874 F.2d at 302, we decline to adopt any type of hard-and-fast requirement for the initial evidentiary showing necessary for standing. The Government very often does not contest a claimant's standing, see 1 David B. Smith, Prosecution and Defense of Forfeiture Cases p 9.04, at p. 9-68.7 (1997), and a rule requiring claimants to support all claims with standing evidence would often involve unnecessary time and expense for the litigants as well as the court. Although a claimant may assert an interest in a defendant property sufficient to confer standing, the Government is always free, as it was in this case, to challenge a claimant's factual allegations, develop information through interrogatories, and flush out would-be claimants with no real interest in a defendant property. Article III requires only that a claimant allege, inter alia, a personal stake in the outcome of the controversy, i.e., an actual or threatened injury. See, e.g., Greater Cincinnati Coalition for the Homeless v. City of Cincinnati, 56 F.3d 710, 715 (6th Cir.1995). Accordingly, we are attentive to the core jurisdictional issue, whether or not Article III's requirements are satisfied, and are less concerned with whether these claimants were the source of the evidence relating to standing. See 116 Emerson St., 942 F.2d at 78-79 (all that must be shown is a "facially colorable interest in the proceedings sufficient to satisfy the case-or-controversy requirement .... ") (citations and quotation omitted). The claimants have taken the essential step of asserting a property interest in the defendant currency in their verified claims. Here, the real question is not the extent or quality of the claimants' property interests, but whether there was sufficient proof of property interests to establish standing and avoid summary judgment on the standing issue. In order to make this determination, we must consider the "pleadings, depositions, answers to interrogatories and admissions on file." Fed.R.Civ.P. 56(c). In this case, the Jellinek Center and White need not have supplemented their claims with additional evidence of colorable property interests because the Government admitted the facts indicating the claimants' relationship to the seized currency in its complaint and in its briefing to the district court.
 
 
 15
 In its complaint, the Government alleged that all but approximately $33,000 of the $702,926.81 which was seized was found in the bedroom occupied by Eddie White. In the complaint, the Government also asserted that Virginia Hurst operated unlawful gambling for various organizations, including the Jellinek Center, and that Hurst transferred the cash receipts from the bingo sites to her home, the location of the seized currency, at which point she would forward the cash to, inter alia, Jellinek after deducting her various expenditures. In its answer to the forfeiture complaint in support of its claim, Jellinek asserted that Hurst operated lawful charitable bingo games on its behalf and that at the time of the seizure, $149,075 of Jellinek's money was in the home of Hurst and was seized as part of the $702,926.81. Jellinek denied the unlawfulness of the bingo operations on its behalf. In its trial brief to the district court, the Government repeated the assertions recited above.
 
 
 16
 While Jellinek's claim did not provide evidence of its ownership interest, in our estimation, Jellinek's claim of ownership, together with its answer to the Government's complaint and the Government's allegations of the nature of Jellinek's involvement with part of the seized currency, are sufficient to establish its standing.[7] See, e.g., $191,910.00, 16 F.3d at 1058 (rejecting Government's argument that claimant lacked standing because he did not explain his possessory interest in detail in his claim); U.S. v. $38,570, 950 F.2d 1108, 1113 ("Flores need not have submitted his claims with additional evidence, because the government had admitted Flores' relationship to the currency in its complaint.... [T]he government admitted ... facts indicating Flores' involvement with the currency"); United States v. 3340 Stallcup, 794 F.Supp. 626, 633 (N.D.Tex.1992) (where allegations in Government's complaint admitted claimant had some involvement with the seized res, such admission sufficient to establish claimant's standing); United States v. 570 Lathers, 2 F.3d 1151, 1993 WL 307084, at * 4 (6th Cir. Aug. 12, 1993) (rejecting Government's argument that claimant introduced insufficient evidence of ownership or possession where the Government conceded that the claimant was only conceivable owner of the seized property and claimant admitted ownership in answer to forfeiture complaint); United States v. Blair, 843 F.2d 1388 (4th Cir.1988) (finding that claimant demonstrated facially colorable ownership interest in seized property where property seized from wife's home and government did not dispute that house was claimant's residence as well); see also, e.g, United States v. Various Computers and Computer Equip., 82 F.3d 582, 585 (3d Cir.) (finding claimant had statutory standing where the claimant's claim did not include statutorily required verification but the district court and the Government were aware of the source of claimant's property interest), cert. denied, --- U.S. ----, 117 S.Ct. 406, 136 L.Ed.2d 320 (1996); 116 Emerson St., 942 F.2d at 78 (holding that where the claimant's court documents adequately apprised government of claim and basis upon which claim rested, the documents, when read together as a whole, evidenced a sufficient interest in the seized property so that the district court properly treated them as satisfying the statutory standing requirements). Just as the Third Circuit reasoned in rejecting the necessity of a claimant's satisfaction of the statutory standing prerequisite of verification of a claim via an oath--"[b]oth the [district] court and the Government were aware of the source of [the claimant]'s interest in the property and the basis of his claim of ownership [and][t]hus, the verification would not have added to the authenticity of [the claimant]'s petition," Various Computers, 82 F.3d at 585 (considering statutory standing requirements)--we similarly conclude that Jellinek's repetition of the Government's assertions would have added nothing to the parties' and the district court's ability to determine Jellinek's standing.
 
 
 17
 We must also address the basis of White's standing. White was not present at the time of the seizure. However, White had constructive possession of the currency in his own bedroom and such a possessory interest is constitutionally sufficient to confer standing in forfeiture actions. Although he was not in actual possession of the currency at the time it was seized, his constructive possession of it confers standing on him in the context of the disclosure of facts surrounding the currency. See United States v. $260,242.00 U.S. Currency, 919 F.2d 686, 687 (11th Cir.1990) (finding standing on basis of constructive possession for a claimant where currency was seized from trunk of car registered to claimant); $38,000.00, 816 F.2d at 1544 (finding standing for claimant-bailee in constructive possession of currency when currency seized from claimant's employee while employee transporting currency at claimant's request); cf., e.g., United States v. Twenty Cashier's Checks, 897 F.2d 1567, 1571 (11th Cir.1990) (affirming on basis of district court's opinion in which district court found no standing for claimant where claimant had neither possession nor dominion over seized property at time of seizure); United States v. $3,799.00 in U.S. Currency, 684 F.2d 674, 678 (10th Cir.1982) (finding that claimant who had no actual or constructive possession of seized currency lacked standing).
 
 
 18
 We caution that we are not altering the necessity of factual support for a colorable interest in seized property. White's standing is not without the necessary evidentiary support. As we explained above in regard to Jellinek's standing, White's colorable possessory interest is spelled out in the Government's own complaint and trial brief. While "a naked claim of possession ... is not enough [and][t]here must be some indication that the claimant is in fact a possessor, not a simple, perhaps unknowing custodian," Mercado, 873 F.2d at 645, we are satisfied with the explanation provided in this case. See $191,910.00, 16 F.3d at 1057-58 (although unexplained possession is not sufficient, where a claimant asserts a possessory interest and provides some explanation of it, e.g., that he is holding the property for a friend or client, he has standing; claimant need not explain interest in detail); $38,000, 816 F.2d at 1544 (finding standing where claimant asserted that he was holding the property as bailee for his brother); United States v. $122,043.00 in U.S. Currency, 792 F.2d 1470, 1473 (9th Cir.1986) (finding explanation that claimant was carrying the seized money for her husband sufficient for standing). In this case, we do not face a naked possession claim; rather than a cash hoard about which no facts are asserted, see $321,470.00, 874 F.2d at 303, we have a good sense of the currency's provenance and White's connection to it. Cf. Mercado, 873 F.2d at 645 (finding no standing for claimant who presented only a naked claim of possession and where the claimant had asserted that he did not know that there was currency in his luggage, had rejected all attempts by the Government to find out how the money made its way into the luggage, had refused to accept a receipt for the seized funds and had told the police that he did not care what they did with the money); United States v. $5,644,540.00 in U.S. Currency, 799 F.2d 1357, 1365 (9th Cir.1986) (holding that claimants who merely viewed car and luggage in which the money was found did not have necessary possessory interest); United States v. $600,000.00 in U.S. Currency, 871 F.Supp. 1397, 1400 (D.Kan.1994) (holding claimant's bare allegation that money found in trunk of car he was driving insufficient to establish standing); United States v. One Gray Samsonite Suitcase, 637 F.Supp. 1162 (E.D.Mich.1986) (claimants failed to establish possessory interest when they admitted they did not recognize either the suitcase or its contents when delivered to their home and they allowed police to remove suitcase following its arrival).
 
 
 19
 It is certainly true that the claimants could have produced more concrete evidence of ownership or possession of the seized currency. We are nonetheless satisfied that the Government's own allegations of fact, which have gone uncontroverted, introduced sufficient explanation of ownership and possession to confer standing on these claimants to challenge the forfeiture. Our determination is buttressed by the fact that the Government has never alleged that any "straw man" transfers occurred. In fact, the Government does not even suggest any conceivable alternative owners of the currency.[8] These facts, while not conclusively establishing the claimants' ownership of the currency, are sufficient to demonstrate facially colorable claims to the property. Accordingly, the claimants had standing to contest the forfeiture.[9]
 
 II. Statute of Limitations
 
 20
 The civil forfeiture provision of 18 U.S.C. § 1955(d) provides for civil forfeiture of property used in violation of federal statutory provisions prohibiting illegal gambling businesses. Section 1955(d) provides, in pertinent part, that
 
 
 21
 [a]ny property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States.
 
 
 22
 The statute also provides a five-year statute of limitations for such forfeiture actions which runs from the time of discovery of the illegal gambling offense.
 
 
 23
 No suit or action to recover any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered.
 
 
 24
 19 U.S.C. § 1621 (emphasis added) (made applicable to forfeiture proceedings by 18 U.S.C. § 1955(d)).
 
 
 25
 The Government argues that the district court erred in dismissing this civil forfeiture action as barred by the five-year statute of limitations. The district court's determination of the timing of the Government's discovery and the concomitant triggering of the statute of limitations under 19 U.S.C. § 1621 was a factual determination. See United States v. 318 So. Third St., 988 F.2d 822, 826 (8th Cir.1993); United States v. Shabahang Persian Carpets, Ltd., 926 F.Supp. 123, 126 (E.D.Wis.1996). As such, we review such a determination for clear error. See Tschira v. Willingham, 135 F.3d 1077, 1082 (6th Cir.1998).
 
 
 26
 The statute of limitations at issue has been enforced according to a "known or should have known" standard, United States v. James Daniel Good Property, 971 F.2d 1376, 1381 (9th Cir.1992), aff'd in part and rev'd in part on other grounds, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), which is short-hand for the rule that an offense is discovered when the Government discovers or possesses the means to discover the alleged wrong, whichever occurs first. See id.; Shabahang, 926 F.Supp. at 125; United States v. $116,000 in U.S. Currency, 721 F.Supp. 701, 703-04 (D.N.J.1989); United States v. R.I.T.A. Organics, Inc., 487 F.Supp. 75, 77-78 (N.D.Ill.1980); see also 318 S. Third St., 988 F.2d at 826-27 (applying such an analysis). The district court concluded that the Government "discovered" the offenses in, at the latest, September 1988, so that the statute of limitations expired in the fall of 1993, before the filing of the forfeiture action on March 14, 1994. After a careful review of the record, we conclude that the district court committed no clear error in its determination.
 
 
 27
 As the district court noted, Eddie White testified before the grand jury on September 13, 1988 about the operation of the bingo games and told the grand jury that Virginia Hurst took home proceeds from the bingo games at the end of the night; he also testified that Hurst had a safe at her house. Frank Kolinsky, the executive director of the Jellinek Center, also testified before the grand jury in September 1988 regarding Hurst's bingo operation for Jellinek and testified that Hurst was in charge of the operation. At that time, he also presented the grand jury with five boxes of financial records of Jellinek's bingo operations. Other witnesses also testified before the grand jury in September 1988 regarding Hurst's operation of the Jellinek bingo games and other games. The Government also had in hand a number of FBI reports of interviews of various people, including an August 1988 interview of Hurst. Finally, in her affidavit supporting the search warrant of Hurst's home, IRS agent Bjorkman stated that she had been investigating illegal bingo operations as part of a statewide investigation for fifteen months, back to at least July of 1988. She also stated that in the course of the investigation she learned that cash was being skimmed from the bingo games and that the bingo operators were taking the skimmed cash and keeping it in their homes. Bjorkman's affidavit specifically referenced Eddie White's September 1988 grand jury testimony. In her testimony before the district court, Bjorkman explained that she knew of the cash skimming by the fall of 1988. Moreover, all of this information was known to the Government by the early fall of 1988.
 
 
 28
 The Government argues that there was a continuing violation of gambling laws and that the currency seized was from relatively recent bingo operations and therefore the statute of limitations had not run. This argument misapprehends the onset of the running of the statute of limitations. The statute of limitations does not run from the date of a particular violation, but from the date of "discovery " of an offense. See, e.g., United States v. Complex Mach. Works Co., 937 F.Supp. 943, 944 (Ct. Int'l Trade 1996) (reiterating such as the terms of the statute). The Government cannot disregard its discovery of earlier occurring offenses in preference for later offenses which would produce a more favorable timeline.
 
 
 29
 The Government also argues that the 1988 FBI and IRS interviews and the grand jury testimony did not establish that an 18 U.S.C. § 1955 violation, which could serve as the basis of the forfeiture, had occurred. The Government contends that while the September 1988 grand jury testimony may have shown that Hurst was operating bingo games in violation of Tennessee law, the grand jury testimony did not establish the other elements of the offense, which were (1) the involvement of five or more persons in the gambling business, and (2) that the gambling business was in continuous operation for over 30 days or had gross revenue exceeding $2000 in a single day. See 18 U.S.C. § 1955. We reject the Government's assertion that it did not have information regarding the other necessary elements of the offense, such that it had not discovered the offense by the fall of 1988. The grand jury was presented with all of Jellinek's business records relating to the bingo operations. Additionally, there was testimony regarding the management and use of workers in the bingo operation. Accordingly, this argument fails. See Shabahang, 926 F.Supp. at 126 (rejecting the Government's contention that evidence did not indicate that an illegal importation offense had been discovered when "[the government] possessed the means to discover the 22 carpets which are the subject of this penalty action ... [T]he information provided shows that ... [the government] had extensive evidence linking Shabahang to the illegal importation.... It is clear that [the government] knew that carpets of Iranian origin were being smuggled into the United States. [The government agent] also knew that the carpet smuggling was connected to Shabahang.").
 
 
 30
 The Government also points to a district court decision, $116,000, 721 F.Supp. 701 (D.N.J.1989), and suggests that that decision offers support for the notion that a discovery coincides with a seizure and that we should look to the seizure date as the date that the statute of limitations began running. The $116,000 decision does not support this argument. Rather, it states that because a seizure is based on probable cause, the same standard for the institution of a forfeiture action, see, e.g., United States v. Thomas, 913 F.2d 1111, 1114 (4th Cir.1990), the Government could not claim that it had not discovered the offense at the time of seizure. See $116,000, 721 F.Supp. at 705; cf. United States v. Real Property, Titled in Names of Godfrey Soon Bong Kang and Darrell Lee, 120 F.3d 947, 949 (9th Cir.1997) (where no indication that Government aware of gambling and no federal agent involvement, offense could not have been "discovered"); 318 So. Third St., 988 F.2d at 826 (where no federal agent involvement with a local investigation, no federal government discovery for statute of limitations purposes).
 
 
 31
 Statutes of limitation are statutes of repose representing "a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." United States v. Kubrick, 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Congress extended the Government five years to develop and file its case. By the fall of 1988, the Government possessed extensive evidence linking the illegal bingo activities to Virginia Hurst and her currency and it possessed information that Hurst was taking cash proceeds home following a night's bingo games. The Government certainly knew or should have known of a federal offense. The Government offers no excuses or mitigating circumstances for its delay in filing the underlying forfeiture action.[10] The purpose of the statute of limitation's notice would be undermined in this case if the Government was allowed to prosecute its action. In any event, the district court did not commit clear factual error in making its assessment of the point of "discovery." Accordingly, we affirm its dismissal on the basis that the Government exceeded the statute of limitations.III. Award of Interest to Claimants
 
 
 32
 The Government asserts that the district court erred in awarding interest on the $515,060.42 in seized currency because the Government never waived its immunity against the assessment of pre-judgment interest. The appeal of this issue presents an important question and one that has yet to be addressed by this circuit. The Government sometimes seizes property for purposes of forfeiture and is later found, for whatever reason, to have no proper claim to the property. When the property is returned to its owner, the question arises, as it did in this case, as to what extent an owner may recover the Government's profit from the use of the seized property.
 
 
 33
 The Government raises this issue via its assertion of error on the part of the district court in awarding interest on the seized funds in its order granting the claimants' Rule 59(e) motion. As previously mentioned, where reconsideration of a grant of summary judgment was sought, we review the granting of a Rule 59(e) motion de novo. See National Leadburners, 129 F.3d at 374. Whether the Government enjoys sovereign immunity in a particular circumstance is a question of law which we review de novo. United States v. $277,000 U.S. Currency, 69 F.3d 1491, 1493 (9th Cir.1995); Rodriguez v. Transnave Inc., 8 F.3d 284, 287 (5th Cir.1993). Accordingly, we turn to a de novo consideration of this issue.
 
 
 34
 In deciding to award interest, the district court relied on the reasoning of a decision by the Ninth Circuit, United States v. $277,000 U.S. Currency, 69 F.3d 1491, 1493 (9th Cir.1995), in which that court awarded a claimant, to whom seized property was returned, "pre-judgment interest" based on the rationale that the interest was not really typical pre-judgment interest, but an aspect of the seized res, and thus the existing sovereignty bar to an award of pre-judgment interest did not enter the picture. We are also persuaded by the reasoning set forth in $277,000, an opinion authored by one of our own, Judge Boggs, when he was sitting by designation in the Ninth Circuit.
 
 
 35
 While sovereign immunity customarily precludes the Government's liability for interest prior to a judgment, Library of Congress v. Shaw, 478 U.S. 310, 311, 315, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), to the extent that the Government has actually or constructively earned interest on seized funds, it must disgorge those earnings along with the property itself when the time arrives for a return of the seized res to its owner. Not every payment of money by the Government related to property that it has seized can be characterized as a forbidden award of pre-judgment interest. For example, where the Government has seized property subject to a mechanic's lien, the innocent lien holder has been allowed to recover not only the basic amount of his lien, but also the costs normally allowed under state law, including statutory interest. See United States v. 1980 Lear Jet, Model 35A, Serial Number 277, 38 F.3d 398, 402 (9th Cir.1994) (holding that Government is "only entitled to receive the sum attributable to that portion of the property that was lawfully forfeited"). Similarly, we do not view the award of interest in this case as the typical award of pre-judgment interest which cannot be recovered absent an express waiver of sovereign immunity; rather, we view this award of interest as an aspect of the seized res to which the Government is not entitled as it did not succeed in its forfeiture action. See $277,000, 69 F.3d at 1493; see also United States v. 92 Buena Vista Ave., 507 U.S. 111, 124, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993) (holding that the Government is not an owner of property before forfeiture has been decreed). In short, there is no issue of sovereign immunity because the Government is not being asked to pay interest, but to disgorge property that was not forfeited. See 1980 Lear Jet, 38 F.3d at 402. Thus, while sovereign immunity prevents a simple claim for pre-judgment interest, the Government may not always profit from the seizure of property which is ultimately returned to the owner.
 
 
 36
 In $277,000, the Ninth Circuit addressed the issue of the extent to which an owner of seized property, to which a court has held that the Government has no claim, may recover the Government's profit from the use of the seized property during a time that the court determines that the Government had no right to retain it. The Ninth Circuit decided that seized funds deposited in the United States Treasury "should be considered as constructively earning interest at the government's alternative borrowing rate at all times" until a judgment is rendered. $277,000, 69 F.3d at 1496. In the Ninth Circuit's view, this constructive interest becomes "part of the res, to be returned with the res to the claimant." Id.
 
 
 37
 Pursuant to an order by the district court in this case, the seized currency was retained as evidence by the IRS as custodian pending criminal prosecution against Virginia Hurst. Following Hurst's entry of a plea, the IRS deposited the funds with the United States Treasury. A special fund has been established by statute in the United States Treasury for seized assets, forfeited assets and proceeds. See 28 U.S.C. § 524(c); $277,000, 69 F.3d at 1494; United States v. $1,322,242.58, 938 F.2d 433, 438 (3d Cir.1991).
 
 
 38
 It is not clear from the record whether or not the Treasury account into which these seized funds were deposited was an interest-bearing account. Compare United States v. $133,735.30 Seized From U.S. Bancorp Brokerage Account, 139 F.3d 729, 731-32, 732-33 n. 3 (9th Cir.1998) (considering issue where seized funds deposited in an interest-bearing account) with $277,000, 69 F.3d at 1494-95 (considering issue where seized funds placed in a non-interest bearing Treasury account). Accordingly, we consider both scenarios.
 
 
 39
 In $277,000, Judge Boggs explained that the act of holding funds in the United States Treasury, even where those funds are held in a non-interest bearing status, financially benefits the federal government. Financial assets in the hands of the Government are a means by which the Government avoids having to borrow equivalent funds. $277,000, 69 F.3d at 1494. Placing the seized currency at issue in a Treasury account meant that the Government was not required to borrow an equivalent sum. "[A]ll financial assets in the hands of the government are a means by which the government does not have to borrow equivalent funds." Id. Federal budget documents have consistently explained that the federal deficit is essentially financed, in part, by any non-interest bearing balances held by the Treasury. Id. (citations omitted). "[I]t is clear that the translation of the cash from sterile paper into a deposit fund in fact redounds to the direct benefit of the federal government, in a manner that is completely equivalent to the earning of interest." Id.
 
 
 40
 Common sense is particularly illuminating in considering this issue. If the Government seized, for example, a pregnant cow[11] and, after the cow gave birth, the Government was found not to be entitled to the cow, it would hardly be fitting that the Government return the cow but not the calf. See Sherwood v. Walker, 66 Mich. 568, 33 N.W. 919 (1887). The Government obtained tangible and calculable financial benefit from the retention of the seized funds at issue. Such financial benefit is constructively part of the res, and that monetary amount must also be returned as an aspect of the seized res. We conclude that when property is returned to an owner from the statutory forfeiture funds in the United States Treasury which bear no interest, see 28 U.S.C. § 524(c), the seized funds should be treated as constructively earning interest at the Government's alternative borrowing rate at all times until the rendering of judgment. Such amounts become part of the res, to be returned with the res to claimants. See $277,000, 69 F.3d at 1497 ("the government will not be allowed to retain the fruits, once the tree has been ordered returned to its owner"); Brooks v. United States, 980 F.Supp. 321, 322 (E.D.Mo.1997) (finding Government liable for interest actually accrued, or if seized funds were placed in Treasury account, the constructively earned interest at Government's alternative borrowing rate from time currency seized until its return).
 
 
 41
 If the district court determines that the funds were placed in an interest-bearing account, then there would be no need to treat the funds as "constructively" earning interest because the funds actually earned interest. In such a case, the Government satisfies its burden to disgorge the benefit that it has received from the use of a claimant's property by turning over the interest actually earned on the seized funds. See $133,735.30, 139 F.3d 729, (holding that where Government places seized funds in an interest-bearing account, the Government must return to claimant the seized funds as well as the interest earned).
 
 
 42
 The Government also argues that even if the claimants are awarded interest, the award of interest should be calculated beginning March 12, 1993 because until that date, the currency was being retained as evidence against Hurst. We agree. There is no suggestion in this case that the seized funds should have been deposited in the United States Treasury prior to their actual deposit date.[12] Accordingly, we affirm the district court's decision to award interest as an aspect of the res to be returned, but only for the time period that the funds were on deposit with the United States Treasury. To the extent that the district court's award of interest was based on an amount calculated for the time period in which the seized funds were being held as evidence, we reverse the district court and remand this matter for calculation of interest consistent with this opinion.
 
 IV. Attorney's Fees
 
 43
 The claimants contend that the district court abused its discretion by denying them attorney's fees under Fed.R.Civ.P. 11 and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.
 
 A. Attorney's Fees under the EAJA
 
 44
 The EAJA provides that prevailing parties shall be awarded attorney's fees unless the Government's position was substantially justified or special circumstances make an award unjust. We review the district court's decision not to award attorney's fees under the EAJA for an abuse of discretion. Pierce v. Underwood, 487 U.S. 552, 562-63, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).
 
 The EAJA provides that:
 
 45
 [e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.
 
 
 46
 28 U.S.C. § 2412(d)(1)(A). Eligibility for a fee award in a civil action thus requires that (1) the claimant was a "prevailing party"; (2) the Government's position was not "substantially justified"; and (3) no special circumstances make an award unjust. Commissioner, INS v. Jean, 496 U.S. 154, 158, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990). The district court found that the Government's position was "substantially justified" and that the claimants were thus not entitled to an award of attorney's fees.
 
 
 47
 In elaborating on the meaning of "substantially justified" under the EAJA, we have explained that
 
 
 48
 [t]he government's position under section 2412(d)(1)(A) is "substantially justified" if it is "justified in substance or in the main"--that is, justified to a degree that could satisfy a reasonable person ... [A] position can be justified even though it is not correct, and we believe it can be substantially (i.e. for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.
 
 
 49
 United States v. Real Property Located at 2323 Charms Road, 946 F.2d 437, 440 (6th Cir.1991) (citation and quotation omitted); see also NLRB v. Michigan Conf. of Teamsters Welfare Fund, 13 F.3d 911, 919 (6th Cir.1993). While the Government was ultimately incorrect and did not prevail, such an outcome does not necessarily lead to an award of attorney's fees under the EAJA. Having considered the factual basis of the Government's case and its legal arguments, we see no indication that the district court abused its discretion in denying the claimants attorney's fees. Accordingly, we affirm that decision.
 
 B. Attorney's Fees under Fed.R.Civ.P. 11
 
 50
 The claimants also assert that the district court erred in denying them attorney's fees under Fed.R.Civ.P. 11. We review a district court's denial of an award of attorney's fees under Rule 11 for an abuse of discretion. Davis v. Crush, 862 F.2d 84, 88 (6th Cir.1988). Rule 11 permits a district court to impose attorney's fees and reasonable expenses against a party who has filed and signed a pleading or motion if it concludes that the pleading or motion has no basis in fact or law. See Fed.R.Civ.P. 11. A litigant may be subject to an assessment of attorney's fees if the district court finds that his claims are frivolous, unreasonable or without foundation or it becomes clear that such is the case and the litigant continues to litigate the claim. See Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). The test for the imposition of Rule 11 sanctions is whether the litigant's conduct was reasonable under the circumstances. Davis, 862 F.2d at 88. We see no indication that the Government acted unreasonably in filing and pursuing this litigation in the district court. Accordingly, we affirm the district court's denial of attorney's fees under Rule 11.
 
 CONCLUSION
 
 51
 For the foregoing reasons, we AFFIRM the district court in part and REVERSE and REMAND in part to the district court.
 
 
 
 [1]
 Early in 1989 the Tennessee Supreme Court struck down this exemption statute, see Secretary of State v. St. Augustine Church, 766 S.W.2d 499 (Tenn.1989), and thereafter these games were flatly illegal. Prior to St. Augustine, the legality of these games was questionable as, at best, the charitable nature of the games was in doubt
 
 
 [2]
 With the exception of approximately $33,000, all of the currency was found in a bedroom occupied by Eddie White
 
 
 [3]
 While $702,926.81 in United States currency was seized in the 1989 search of Virginia Hurst's home, approximately $187,864.89 of the money was later returned to Hurst. The remaining seized currency, $515,060.42, is the defendant in the underlying forfeiture action
 
 
 [4]
 Hurst was called but did not testify
 
 
 [5]
 The Government did raise the issue in a June 5, 1995 trial brief. However, it never raised the issue of standing again until after the district court dismissed the case on limitations grounds on October 10, 1995. The Government then directly raised the issue for resolution in its Rule 59(e) motion. In denying the motion, the district court did not specifically address the issue. See J.A. 147
 
 
 [6]
 Similarly, bare legal title, in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture. See 526 Liscum Dr., 866 F.2d at 216; United States v. 900 Rio Vista Blvd., 803 F.2d 625, 630 (11th Cir.1986); United States v. 2511 E. Fairmount Ave., 722 F.Supp. 1273, 1279 (D.Md.1989) ("The mere assertion of legal title to property may not be sufficient to establish standing, for issues of actual possession, control, and financial stake must also be considered.")
 
 
 [7]
 Because Jellinek asserts its own ownership interest in the money and not as a bailee asserting the ownership interest of a bailor, we need not consider the situation where a claimant raises only the interests of another. See $191,910.00, 16 F.3d at 1058 n. 12 (noting lack of need to consider circumstance where claimant raises the interest of another where the claimant merely asserts his own property interest); see also, e.g., United States v. $260,242.00 U.S. Currency, 919 F.2d 686, 687-88 (11th Cir.1990) (distinguishing a claimant who asserts that seized property is his own from a bailee-claimant)
 
 
 [8]
 In fact, in the forfeiture complaint the Government asserted that Virginia Hurst disclaimed any interest in the currency seized from her home in her plea agreement in the Eastern District of Tennessee and stated that she would make no further claim on such property. Hurst had claimed that $198,864.89 belonged to her and after an amount owed to the IRS was deducted, the remaining sum was returned to her
 
 
 [9]
 We note that we have been confronted only with the issue of standing. Although the forfeiture action has been dismissed, the district court retains the authority to make an appropriate disposition of the property. "It is well established that a federal court may consider collateral issues after an action is no longer pending." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 394-95, 396, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (holding that federal court retains jurisdiction over collateral issues after action is voluntarily dismissed pursuant to Rule 41); see, e.g., United States v. 414 Kings Highway, 128 F.3d 125, 127 (2d Cir.1997) ("Though the forfeiture action has been dismissed, the [district] court retained authority to make an appropriate disposition of the proceeds from the sale of the Property."); see also Valley Disposal, Inc. v. Central Vt. Solid Waste Management Dist., 71 F.3d 1053, 1056 (2d Cir.1995) (discussing and applying Cooter & Gell 's holding regarding district court's retention of jurisdiction over collateral matters after a case's dismissal). Given that we have only been concerned with the claimants' standing and that White's claim does not even specify the exact amount to which he asserts ownership, we of course leave any other matters to the district court as it takes up the disposition of the seized property, a matter it stayed pending this appeal pursuant to an order entered October 10, 1995
 
 
 [10]
 Hurst was convicted of federal gambling offenses in 1990 and again in March 1993; however, the Government did not file the underlying forfeiture action against the currency seized from her home until March 1994
 
 
 [11]
 We do not claim any originality in our allusion. We rely on the same bovine cited by Judge Boggs in his explication of this issue in $277,000
 
 
 [12]
 We note that the claimants have not asserted any wrongdoing or inappropriate conduct on the part of the Government in holding the currency as evidence pending Virginia Hurst's prosecution. See 1992 Annual Report of the Dep't of Justice Asset Forfeiture Program 87 (FY 1992 Fin. Statement, n. 5) (describing the fund for assets before forfeiture, established pursuant to § 524(c)(5), as "a holding account for non-evidentiary cash") (emphasis added) (cited in $277,000, 69 F.3d at 1494). There may be circumstances where the Government should have placed seized funds in the United States Treasury earlier than they actually did. See 28 U.S.C. § 524(c)(4) (requiring the deposit of seized assets and proceeds in funds established by § 524 in the United States Treasury); United States v. $1,322,242.58, 938 F.2d 433 (3d Cir.1991); see also, e.g., $277,000, 69 F.3d at 1494 ("Where a disputed res is capable of being put to use for someone, it makes no sense whatsoever that a pile of dollar bills should be left doing no good for anyone. Certainly in any normal commercial dispute over property, the disputed property would, as soon as practical, be placed in an escrow account to earn interest that would go to whomever was the ultimate winner."); United States v. Kingsley, 851 F.2d 16, 19 (1st Cir.1988) (noting that a government policy of placing seized funds in a non-interest-bearing account would be irrational and awarding interest to claimant from time claimant reasonably relied on district court order to place funds in an interest-bearing account). Given that in this case there is no challenge to the legitimacy of the Government's handling of the currency during the pendency of this action and the criminal prosecution of Hurst, we need not consider such a scenario. While we envision many reasons why the Government might need to retain seized currency for its use as evidence, we also envision the possibility of a government delay in the deposit of seized funds beyond the need for their use in an evidentiary capacity. We leave such a possibility for another day when it actually arises and do not pretend that our holding reaches such a circumstance